## GASCADE NATURAL GAS CORP. *v.* EL PASO NATURAL GAS CO. ET AL.

No. 4. Argued January 12, 1967.—Decided February 27, 1967.*

---

*Together with No. 5, *California* v. *El Paso Natural Gas Co. et al.*, and No. 24, *Southern California Edison Co.* v. *El Paso Natural Gas Co. et al.*, also on appeal from the same court.

130

Richard B. Hooper argued the cause for appellant in No. 4. With him on the brief were H. B. Jones, Jr., and Wilbert Carl Anderson. William M. Bennett argued the cause and filed a brief for appellant in No. 5. Rollin E. Woodbury argued the cause for appellant in No. 24. With him on the brief were Harry W. Sturges, Jr., and William E. Marx.

Gregory A. Harrison argued the cause and filed a brief for appellee El Paso Natural Gas Co. in all cases. Daniel M. Friedman argued the cause for the United States in all cases. On the brief were Solicitor General Marshall, Assistant Attorney General Turner, Richard A. Posner and Milton J. Grossman.

Richard W. Sabin, Assistant Attorney General of Oregon, by special leave of Court, argued the cause for the State of Oregon, as amicus curiae. With him on the brief was Robert Y. Thornton, Attorney General.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

When this case was here the last time,[1] we held that the acquisition of Pacific Northwest Pipeline Corporation by El Paso Natural Gas Company violated § 7 of the Clayton Act; and we directed the District Court "to order divestiture without delay." United States v. El Paso Natural Gas Co., 376 U. S. 651, 662. That was on April 6, 1964. It is now nearly three years later and, as we shall see, no divestiture in any meaningful sense has been directed. The United States, now an appellee, maintains that the issues respecting divestiture are not

---

[1] California v. Federal Power Commission, 369 U. S. 482, involved another aspect of the same merger; and we held that the Commission should not have approved it until the District Court decided whether it violated § 7 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 18.

before us. The threshold question does indeed involve another matter. Appellants were denied intervention by the District Court and came here by way of appeal, 32 Stat. 823, 15 U. S. C. § 29. We noted probable jurisdiction. 382 U. S. 970.

## I.

The initial question concerning intervention turns on a construction of Rule 24 (a) of the Federal Rules of Civil Procedure entitled "Intervention of Right." At the time the District Court ruled on the motions that Rule provided in relevant part, "Upon timely application anyone shall be permitted to intervene in an action . . . (3) when the applicant is so situated as to be adversely affected by . . . disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof." As amended effective July 1, 1966, subsequent to the time these motions to intervene were denied, Rule 24 (a) (2) provides that there may be intervention of right, "when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

California, one of the appellants, is a State where El Paso sells most of its gas and its purpose in intervening was to assure that Pacific Northwest, illegally merged with El Paso, or its successor, would be restored as an effective competitor in California. As we noted in the prior opinion, Pacific Northwest had been "a substantial factor in the California market at the time it was acquired by El Paso." 376 U. S., at 658. It was to restore that "competitive factor" that divestiture was ordered. *Id.*, at 658–662. Southern California Edison, another

appellant, is a large industrial user of natural gas purchasing from El Paso sources and desirous of retaining competition in California. Cascade Natural Gas is a distributor in Oregon and Washington, and its sole supplier of natural gas was Pacific Northwest and will be the New Company created under the divestiture plan. Cascade maintains that there has been a grossly unfair division of gas reserves between El Paso and the New Company, particularly in the southwest field known as the San Juan Basin. Moreover, the District Court approved contracts between El Paso and the New Company for delivery of gas both from Canada and from the San Juan Basin, and allowed El Paso unilaterally and without application to the Federal Power Commission, to saddle new and allegedly onerous prices and other conditions on the New Company. Moreover, the stock of West Coast Transmission Co., Ltd., was ordered sold for the benefit of El Paso. Pacific Northwest had owned about a fourth of West Coast Transmission's stock and that ownership gave Pacific Northwest, it is said, special insight into and access to the Canadian gas supply. These factors, implicating the ability of Pacific Northwest to perform in the future, give Cascade, it is argued, standing to intervene.

Under old Rule 24 (a)(3) those "adversely affected" by a disposition of property would usually be those who have an interest in the property.[2] But we cannot read it to mean exclusively that group.

Rule 24 (a)(3) was not merely a restatement of existing federal practice at law and in equity. If it had been, there would be force in the argument that the rigidity of the older cases remains unaltered, restricting intervention as of right very narrowly, as for example where there is a fund in court to which a third party asserts

---

[2] See *Board of Comm'rs* v. *Bernardin,* 74 F. 2d 809, 816; *Dowdy* v. *Hawfield,* 88 U. S. App. D. C. 241, 242, 189 F. 2d 637, 638.

a right that would be lost absent intervention. *Credits Commutation Co. v. United States*, 177 U. S. 311, 316; *Central Trust Co. v. Chicago, R. I. & P. R. Co.*, 218 F. 336, 339. But the Advisory Committee stated that Rule 24 "amplifies and restates the present federal practice at law and in equity." We therefore know that some elasticity was injected;[3] and the question is, how much. As stated by the Court of Appeals for the Second Circuit in the *Central Trust Co.* case, "It is not always easy to draw the line." *Ibid.*

In *Missouri-Kansas Pipe Line Co. v. United States*, 312 U. S. 502, a consent decree was entered in an anti-trust suit, designed to protect Panhandle from Columbia which had acquired domination of the former to stifle

---

[3] In 1966 the Advisory Committee when making a revision of Rule 24 (a) said:

"Rule 24 (a)(3) as amended in 1948 provided for intervention of right where the applicant established that he would be adversely affected by the distribution or disposition of property involved in an action to which he had not been made a party. Significantly, some decided cases virtually disregarded the language of this provision. Thus Professor Moore states: 'The concept of a fund has been applied so loosely that it is possible for a court to find a fund in almost any *in personam* action.' 4 *Moore's Federal Practice* ¶ 24.09[3], at 55 (2d ed. 1962), and see, *e. g., Formulabs, Inc. v. Hartley Pen Co.*, 275 F. 2d 52 (9th Cir. 1960). This development was quite natural, for Rule 24 (a)(3) was unduly restricted. *If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene, and his right to do so should not depend on whether there is a fund to be distributed or otherwise disposed of.* Intervention of right is here seen to be a kind of counterpart to Rule 19 (a)(2)(i) on joinder of persons needed for a just adjudication: where, upon motion of a party in an action, an absentee should be joined so that he may protect his interest which as a practical matter may be substantially impaired by the disposition of the action, he ought to have a right to intervene in the action on his own motion. See Louisell & Hazard, *Pleading and Procedure: State and Federal* 749–50 (1962)." 4 Moore, Federal Practice (1966 Spec. Supp.), c. 24, pp. 1–2. (Emphasis supplied.)

its competition. The decree sought to assure opportunities for competition by Panhandle. A security holder of Panhandle sought to intervene on Panhandle's behalf when the consent decree was reopened and was denied that right. We reversed, noting at the outset that "the circumstances under which interested outsiders should be allowed to become participants in a litigation is, barring very special circumstances, a matter for the *nisi prius* court. But where the ɛ ↗forcement of a public law also demands distinct safeguarding of private interests by giving them a formal status in the decree, the power to enforce rights thus sanctioned is not left to the public authorities nor put in the keeping of the district court's discretion." *Id.,* at 506.

We noted that Panhandle's economic independence was "at the heart of the controversy." *Ibid.* In the present case protection of California interests in a competitive system was at the heart of our mandate directing divestiture. For it was the absorption of Pacific Northwest by El Paso that stifled that competition and disadvantaged the California interests. It was indeed their interests, as part of the public interest in a competitive system, that our mandate was designed to protect. In that sense the present case is very close to *Pipe Line Co.* Apart from that but in the spirit of *Pipe Line Co.* we think that California and Southern California Edison qualify as intervenors under Rule 24 (a)(3). Certainly these two appellants are "so situated" geographically as to be "adversely affected" within the ṛ ̤aning of Rule 24 (a)(3) by a merger that reduces the competitive factor in natural gas available to Californians. We conclude that it was error to deny them intervention. We need not decide whether Cascade could have intervened as of right under that Rule. For there is now in effect a new version of Rule 24 (a) which in subsection (2) recognizes as a proper element in intervention " ᴺ interest" in the "transaction which is the subject of the action." This Rule applies to

"further proceedings" in pending actions. 383 U. S. 1031. Since the entire merits of the case must be reopened to give California and Southern California Edison an opportunity to be heard as of right as intervenors, we conclude that the new Rule 24 (a)(2) is broad enough to include Cascade also; and as we shall see the "existing parties" have fallen far short of representing its interests. We therefore reverse the District Court in each of these appeals and remand with directions to allow each appellant to intervene as of right, to vacate the order of divestiture and to have *de novo* hearings on the type of divestiture we envisioned and made plain in our opinion in 376 U. S. 651.

## II.

The necessity for new hearings needs a word of explanation.

The United States on oral argument stated that the decree to which it agreed and which it urges us to approve was made in "settlement" of the litigation. We do not question the authority of the Attorney General to settle suits after, as well as before, they reach here. The Department of Justice, however, by stipulation or otherwise has no authority to circumscribe the power of the courts to see that our mandate is carried out. No one, except this Court, has authority to alter or modify our mandate. *United States* v. *du Pont & Co.,* 366 U. S. 316, 325. Our direction was that the District Court provide for "divestiture without delay." That mandate in the context of the opinion plainly meant that Pacific Northwest or a new company be at once restored to a position where it could compete with El Paso in the California market.

We do not undertake to write the decree. But we do suggest guidelines that should be followed:

(1) *Gas Reserves.* The gas reserves granted the New Company must be no less in relation to present existing

reserves than. Pacific Northwest had when it was independent; and the new gas reserves developed since the merger must be equitably divided between El Paso and the New Company. We are told by the intervenors that El Paso gets the new reserves in the San Juan Basin—which due to their geographical propinquity to California are critical to competition in that market. But the merged company, which discovered them, represented the interests both of El Paso and of Pacific Northwest. We do not know what an equitable division would require. Hearings are necessary, followed by meticulous findings made in light of the competitive requirements to which we have adverted.

· As already indicated, the proposed decree provides the terms of contracts [4] imposed on the New Company respecting the purchase and gathering of gas from various sources. It is urged that these contracts are onerous, detrimental to the New Company, and partial to El Paso interests. We do not pass upon the wisdom or desirability of the proposed contracts. It is enough to note that they were proposed by El Paso, that the changes, reluctantly acceded to by the Government, will redound to the substantial benefit of El Paso, and that the New Company has had no opportunity to evaluate the advisability of the terms or to negotiate for better terms. · Nor has the Federal Power Commission had the opportunity to pass

---

[4] For example, one contract relates to reciprocal gas gathering between the New Company and El Paso in the San Juan Basin. Prior to the merger El Paso and Pacific Northwest entered into a contract providing that they would develop gathering lines in the basin cooperatively, and that whichever company made greater use of the other's gathering lines would pay a gathering charge of 1.375¢ per Mcf. of extra gas. El Paso did much more gathering for Pacific Northwest than Pacific Northwest did for El Paso. The proposed agreement increases the gathering charge to 4.5¢. The intervenors claim that the increased rate will substantially increase the New Company's costs and impair its ability to compete.

upon the contracts. The terms of these contracts should be negotiated by the New Company under such restrictions as the Natural Gas Act may impose.

(2) *Financial Aspects.* As noted, El Paso is allowed to sell the stock of West Coast Transmission Co., Ltd., brought into the merger by Pacific Northwest, and keep the proceeds, which if stock prices at the time of the proposed divestiture are considered might result, it is alleged, in a profit of $10,000,000 or more, while the New Company gets the stock of Northwest Production Co. which from 1960–1963 showed heavy losses. It is charged that by the proposed decree El Paso is saving the cream for itself and foisting the "cats and dogs" on the New Company. It is also earnestly argued that the New Company will sorely need the valuable and fairly liquid stock of West Coast Transmission if it is to have the working capital necessary to restore the competitive balance that the merger destroyed. These are highly relevant arguments. Certainly a plan of divestiture of the kind we envisaged must establish a New Company in the same or comparable competitive position that Pacific Northwest was in when the illegal merger obliterated it.

It is also pointed out that some $53,000,000 of taxable losses which Pacific Northwest had were utilized by El Paso during the years following the ill-starred merger. It is argued that since these tax loss carry-overs were in a real sense an asset of Pacific Northwest utilized by El Paso, the New Company should receive other assets or a reduction in debt of equivalent value. These allegations, if proven, require remuneration of some kind to the New Company. For it must be a viable, healthy unit, as able to compete as Pacific Northwest was when it was acquired by El Paso.

(3) *Control of El Paso.* The divestiture decree provides that El Paso is to cause the formation of the New Company, whose chief executive shall be approved by

El Paso, the Government, and the court. The new company is to file an application with the Federal Power Commission "at the earliest practicable date" requesting the issuance of a certificate of public convenience and necessity authorizing it to acquire, own, and operate the properties to be received from El Paso.[5]  When the necessary certificates, authorizations, and orders are obtained from the FPC, El Paso is to transfer to the New Company the properties and assets set forth in the plan of divestiture, generally those which El Paso received from Pacific Northwest.  In return, the New Company is to assume certain of El Paso's indebtedness and issue to El Paso all its common stock.  El Paso is to transfer the New Company stock to the New Company's chief executive, as voting trustee.  The New Company's chief executive shall release the stock only in accordance with the plan for divestment of El Paso's interest in the stock.  Under the plan, El Paso is ordered completely to divest itself of all interest in the New Company stock within three years after the transfer of the assets to the New Company. Alternate methods of divestment are provided.  (1) El Paso *may,* within 18 months of the transfer, distribute at least 80% of the shares to holders of El Paso common stock who are willing to exchange their El Paso shares for New Company shares, and who shall own no other El Paso shares immediately after the exchange.  The remainder of New Company stock would be disposed of by a public offering.  (2) If El Paso does not dispose of the New Company stock under the first alternative, it is to dispose of the New Company stock "by one or more sales to the public."  At such public offering no El Paso officer or director and no owner of El Paso's capital stock,

---

[5] We are informed that the New Company's chief executive has been approved and that the New Company has applied to the Federal Power Commission for certification. The FPC proceedings have been continued until this Court has decided this appeal.

in excess of one-half of one percent of the total shares outstanding, shall be permitted to purchase New Company stock.[6]

Thus the El Paso-Pacific Northwest combination will not begin to be severed until the regulatory approvals have been obtained. Complete divestiture is not required until three years after the transfer of assets. An earlier divestiture is permissible, but divestiture is mandatory only after three years. During the interregnum between the entry of the decree and the regulatory approvals, and between the transfer of assets and El Paso's eventual disposition of the New Company stock, El Paso will continue to reap the benefits of the illegal combination. Moreover, prior to the eventual disposition of the New Company stock, all the stock is to be voted by the New Company's chief executive. The chief executive is to be approved by El Paso, and El Paso is the beneficial owner of the stock to be voted by him. Even though the chief executive is subject to the ultimate control and supervision of the District Court, there is danger that he may vote the New Company stock in a manner calculated to perpetuate the very conditions which led us to order severance of the illegal combination.

Even after the mandatory disposition of the new company stock there is considerable danger that El Paso interests may end up controlling the New Company. The decree, to be sure, provides that neither El Paso officers and directors nor owners of more than one-half of one percent of El Paso stock shall purchase New Company stock at a public offering. But the decree does not pro-

---

[6] El Paso is also enjoined from having as an officer or director any person who is also an officer, director, or employee of the New Company or who owns any capital stock of the New Company or whose immediate family owns more than one-tenth of one percent of the stock of the New Company.

hibit members of the families of such prohibited pur-
chasers from obtaining New Company stock. Further,
under the terms of the decree, it would be possible for a
group of El Paso stockholders, each with less than one-
half of one percent of El Paso stock, to acquire at the
initial public offering enough New Company stock sub-
stantially to influence or even to dominate the New Com-
pany. Or, such a group could combine with the families
of prohibited purchasers in order to control the New
Company. After the exchange or public offering, there is
no restriction on the number of New Company shares
El Paso shareholders may acquire. Thus, there is a
danger that major El Paso stockholders may, subsequent
to the exchange or public offering, purchase large blocks of
New Company stock and obtain effective control. Thus,
there has been no studied attempt to ensure the swift
severance of the illegal combination or to make sure that
the New Company's stock does not end up controlled by
El Paso interests. Disposition of all of the stock with
all convenient speed is necessary and conditions must
be imposed to make sure that El Paso interests do not
acquire a controlling interest. For if they do, the New
Company might well be only El Paso under the masquer-
ade of a beard.

The proposed decree bypasses completely the prospect
of an outright purchase of the assets of the New Company
or its stock by outside interests. Two purchasers ap-
parently are anxious and eager; and before the United
States knuckled under to El Paso and "settled" this litiga-
tion, it represented to the District Court that a "sale to a
third party is both a desirable and possible alternative to
the El Paso plan." No alternative of that kind was
chosen. El Paso carried the day, obtained a decree that
promises to perpetuate rather than terminate this un-
lawful merger, and that threatens to turn loose on the

public a New Company unable to maintain the competitive role that Pacific Northwest filled before this illegal transaction took place.

The convenience of El Paso would be the easier choice. The enforcement of our mandate and § 7 of the Clayton Act is the harder one; but that is the criterion we follow.

The evil with which the proposed decree is permeated reflects the attitude or philosophy of the District Court which was frankly stated after our remand as follows:

> "The Court: You see, what this plan proposes is a division of the country, a division of the market, a division of the reserves, one area to New Company and another area to El Paso. That's what the root of this plan is.
>
> "Now, if you're going to get New Company down here in competition in Southern California from the San Juan Basin, you'd upset the whole scheme. To even that situation up, you're going to have to put El Paso up in the Northwest in competition there; and that's a kind of ridiculous thing—long pipelines from these various sources.
>
> "It seems to me to make a lot of sense that New Company operating in the Northwest from very much closer Canadian reserves, and Northwest reserves, and El Paso down in the Southwest, with reserves in the San Juan Basin, serving the Southern California area, among some other areas. That seems to me to make a lot of sense."

The proposed decree in its various ramifications does precisely that. It therefore does the opposite of what our prior opinion and mandate commanded. Once more, and nearly three years after we first spoke, we reverse and remand, with directions that there be divestiture without delay and that the Chief Judge of the Circuit or the Judicial Council of the Circuit (28 U. S. C. § 332)

assign a different District Judge to hear the case. Cf. *United States* v. *Hatahley,* 257 F. 2d 920, 926, and its sequel, *United States* v. *Ritter,* 273 F. 2d 30, 32; *Occidental Petroleum Corp.* v. *Chandler,* 303 F. 2d 55, 57; *Texaco, Inc.* v. *Chandler,* 354 F. 2d 655, 657.

*Reversed.*

MR. JUSTICE WHITE and MR. JUSTICE FORTAS took no part in the consideration or decision of these cases.

MR. JUSTICE STEWART, whom MR. JUSTICE HARLAN joins, dissenting.

The question presented by these appeals, and the only question, is whether the District Court erred in denying the appellants' motions to intervene as parties. Because I think the Court's answer to that question is wrong, and because I think the Court has gone further astray in undertaking to address itself to issues which are not here for adjudication, I respectfully dissent.

Intervention of right is governed by Federal Rule of Civil Procedure 24 (a). At the time the District Court passed on appellants' motions to intervene,[1] that Rule provided as follows:

"Rule 24.  Intervention

"(a) Intervention of Right.  Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or

---

[1] The Rule has since been amended. See p. 153, *infra.*

144

subject to the control or disposition of the court or an officer thereof."

I gather it is common ground that neither 24 (a)(1) nor 24 (a)(2) applies to these cases. No appellant claims any statutory right to intervene under 24 (a)(1). And it is clear that no appellant has any right to intervene under 24 (a)(2), for in order to intervene under that provision, the applicant for intervention must show that he "may be bound" by the judgment in the Government's action in a res judicata sense. *Sam Fox Publishing Co. v. United States,* 366 U. S. 683; *Sutphen Estates, Inc. v. United States,* 342 U. S. 19. See *Credits Commutation Co. v. United States,* 177 U. S. 311. And it is settled that the judgment in a government suit has no res judicata effect on private antitrust claims. *Sam Fox Publishing Co. v. United States, supra.*

The Court, however, finds that the State of California and Southern California Edison Co. have an absolute right to intervene under 24 (a)(3). I disagree for several reasons.

Analysis of the Rule's proper scope must begin with an historical examination of intervention practice, for, as the Court has stated, the Rule constitutes a "codification of general doctrines of intervention." *Missouri-Kansas Pipe Line Co. v. United States,* 312 U. S. 502, 508.[2] Intervention to assert an interest in property within the court's control or custody derives from the English doctrine of appearance *pro interesse suo.* When a court acquired *in rem* jurisdiction over property, by admiralty libel, sequestration, receivership, or other process, a person claiming title or some other legal or equitable interest

---

[2] This statement is confirmed by the Rules Advisory Committee, which observed that the Rule "amplifies and restates the present federal practice at law and in equity." Advisory Committee on Rules for Civil Procedure, Notes, 25 (March 1938).

was allowed to come in to assert his claim to the property. Otherwise, he would have been subjected to the obvious injustice of having his claim erased or impaired by the court's adjudication without ever being heard. Elements of this procedure were gradually assimilated in this country, *e. g., Pennock* v. *Coe,* 23 How. 117, and provided the foundation for intervention doctrine in the federal courts.[3]

Various generalizations about the nature of the property interest that will support intervention of right under this doctrine have been attempted. This Court has stated that the requisite interest must be "of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." *Smith* v. *Gale,* 144 U. S. 509, 518.[4] Other courts have spoken of "a legal interest as distinguished from interests of a general and indefinite character," *Radford Iron Co.* v. *Appalachian Electric Power Co.,* 62 F. 2d 940, 942 (C. A. 4th Cir.), cert. denied, 289 U. S. 748, or "one that is known and protected by the law, sufficient and of the type to be denominated a lien, legal or equitable," *Gross* v. *Missouri & A. Ry. Co.,* 74 F. Supp. 242, 249 (D. C. W. D. Ark.). These formulations are of limited use in deciding particular cases. More illuminating are examples of particular interests which have been held to support intervention of right under the established practice. These have included the

---

[3] For a discussion of the English and early American practice, see 4 Moore, Federal Practice ¶ 24.03; 2 Street, Federal Equity Practice §§ 1364–1370 (1909).

[4] Quoting with approval *Horn* v. *Volcano Water Co.,* 13 Cal. 62, 69. Subsequent federal decisions following this formulation include *Pure Oil Co.* v. *Ross,* 170 F. 2d 651, 653 (C. A. 7th Cir.); *Dowdy* v. *Hawfield,* 88 U. S. App. D. C. 241, 242, 189 F. 2d 637, 638, cert. denied, 342 U. S. 830.

claim of ownership in attached property,[5] the claim of a part owner to personal property being foreclosed under a mortgage,[6] a mortgage lien on a leasehold interest subjected to forfeiture,[7] and the claim of the purchaser of land involved in foreclosure proceedings against the seller.[8] Interests like these have continued to provide a familiar basis for intervention of right since the promulgation of Rule 24 (a)(3).[9]

The other traditional basis for intervention under 24 (a)(3) derives from interpleader practice; when a number of persons possess claims to a fund which are or may be mutually exclusive, intervention is allowed a claimant. Thus, in *Oliver* v. *United States,* 156 F. 2d 281 (C. A. 8th Cir.), the United States had acquired certain land and deposited the purchase price in court to be divided among the various owners. A title insurance company which asserted a claim to the proceeds, based on services rendered to the sellers, was allowed to intervene.[10]

Under Rule 24 (a)(3) the federal courts have sometimes allowed intervention even though the interest likely to be "adversely affected" was not one that would be recognized under traditional interpretations of the *pro interesse suo* or interpleader types of intervention. A representative case is *Formulabs, Inc.* v. *Hartley Pen Co.,* 275 F. 2d 52 (C. A. 9th Cir.), cert. denied, 363 U. S.

---

[5] *Krippendorf* v. *Hyde,* 110 U. S. 276.

[6] *Osborne & Co.* v. *Barge,* 30 F. 805 (C. C. N. D. Iowa).

[7] See *United States* v. *Radice,* 40 F. 2d 445 (C. A. 2d Cir.).

[8] *Gaines* v. *Clark,* 51 App. D. C. 71, 275 F. 1017.

[9] *E. g., Plitt* v. *Stonebraker,* 90 U. S. App. D. C. 256, 195 F. 2d 39 (intervention granted to creditor asserting security interest in goods seized by marshal).

[10] For expansive interpretations of interpleader-type intervention, see *Barnes* v. *Alexander,* 232 U. S. 117; *Peckham* v. *Family Loan Co.,* 212 F. 2d 100 (C. A. 5th Cir.). But see *Vaughan* v. *Dickinson,* 19 F. R. D. 323 (D. C. W. D. Mich.), aff'd, 237 F. 2d 168 (C. A. 6th Cir.).

830. The applicant for intervention had licensed a secret manufacturing process to one of the parties, and the other party was seeking to apply discovery to the process. Finding that the trade secret was "property" subject to the court's control and that the secrecy which was the heart of the applicant's interest in that property might be totally destroyed, the court allowed intervention under 24 (a)(3).

But the claims of California and the Southern California Edison Co. in these cases lie far beyond the reach of even the most imaginable construction of 24 (a)(3). To be sure, the assets of El Paso are "property which is in the custody or subject to the control or disposition of the court" for purposes of the Rule. *Sutphen Estates, Inc.* v. *United States,* 342 U. S. 19. But the "interest" in these assets relied upon by the appellants to justify intervention is merely their preference that certain of the assets, particularly the San Juan Basin reserves, end up in the hands of New Company rather than El Paso, on the theory that such an allocation may be conducive to greater gas competition in California. These general and indefinite interests do not even remotely resemble the direct and concrete stake in litigation required for intervention of right. The Court's decision not only overturns established general principles of intervention, but, as will be shown below in detail, also repudiates a large and long-established body of decisions specifically, and correctly, denying intervention in government antitrust litigation.

This Court is all too familiar with the fact that antitrust litigation is inherently protracted. Indeed, it is just such delay which seems to so concern the Court in this case. But nothing could be better calculated to confuse and prolong antitrust litigation than the rule which the Court today announces. The entrance of additional parties into antitrust suits can only serve

to multiply trial exhibits and testimony, and further confound the attempt to bring order out of complicated economic issues. For these reasons, federal courts have been most reluctant to grant intervention under 24 (a)(3) even in private antitrust litigation. For example, in *Commonwealth Edison Co.* v. *Allis-Chalmers Mfg. Co.*, 315 F. 2d 564 (C. A. 7th Cir.), cert. denied, 375 U. S. 834, the State of Illinois, representing consumers' interests in a possible rate rebate, was denied intervention in a suit brought by a utility charging equipment manufacturers with price fixing.[11]

The reasons for denying intervention are even stronger when intervention is sought in an antitrust suit brought by the Government. To the extent that the would-be intervenor seeks to press his own private antitrust claims against the defendant, intervention must be denied because Congress has carefully provided separate statutory procedures for private and public antitrust litigation.[12] As the Court observed in *United States* v. *Borden Co.*, 347 U. S. 514, 518–519, the thrust of the Clayton Act "is sharply to distinguish between Government suits, either criminal or civil, and private suits for injunctive relief or for treble damages. Different policy considerations govern each of these. They may proceed simultaneously or in disregard of each other." [13] The Court has accordingly approved the "unquestionably sound policy of not

---

[11] Cf. *American Louisiana Pipe Line Co.* v. *Gulf Oil Corp.*, 158 F. Supp. 13 (D. C. E. D. Mich.) (county not allowed to intervene on behalf of consumers in private gas contract dispute). See also *Philadelphia Electric Co.* v. *Westinghouse Electric Corp.*, 308 F. 2d 856 (C. A. 3d Cir.), cert. denied, 372 U. S. 936.

[12] See 26 Stat. 209 (1890), as amended, 15 U. S. C. § 4; 38 Stat. 731 (1914), 15 U. S. C. § 15; 69 Stat. 282 (1955); 15 U. S. C. § 15a; 38 Stat. 736, as amended, 737, 15 U. S. C. §§ 25, 26; 32 Stat. 823 (1903), as amended, 15 U. S. C. §§ 28, 29.

[13] Quoting with approval *United States* v. *Bendix Home Appliances*, 10 F. R. D. 73, 77 (D. C. S. D. N. Y.).

permitting private antitrust plaintiffs to press their claims against alleged violators in the same suit as the Government." Sam Fox Publishing Co. v. United States, 366 U. S. 683, at 693. A fortiori, intervention is improper when a private party appears in order to vindicate his theory of the public interest in an action brought by the Government. For as the Court has consistently recognized, it is the "United States, which must alone speak for the public interest" in antitrust litigation. Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co., 269 U. S. 42, 49.[14] The appellants here seek intervention to press their own version of what the public interest in gas competition in California requires. But the determination of what the public interest requires is the statutory duty and responsibility of the Government. The law explicitly requires that suits brought by the Government for injunctive relief shall be "under the direction of the Attorney General." 15 U. S. C. §§ 4 and 25. That statutory command is violated when private parties are allowed to intervene and control public suits. The Government's discharge of its duties would be completely undermined if its antitrust litigation were cluttered with a myriad of private volunteers, all pressing their own particular interpretations of the "public interest" against the defendant, the Government, and each other.

It has been the consistent policy of this Court to deny intervention to a person seeking to assert some general

[14] In United States v. Borden Co., 347 U. S. 514, 518, the Court stated: "The private-injunction action, like the treble-damage action under § 4 of the Act, supplements government enforcement of the antitrust laws; but it is the Attorney General and the United States district attorneys who are primarily charged by Congress with the duty of protecting the public interest under these laws. The Government seeks its injunctive remedies on behalf of the general public; the private plaintiff, though his remedy is made available pursuant to public policy as determined by Congress, may be expected to exercise it only when his personal interest will be served."

public interest in a suit in which a public authority charged with the vindication of that interest is already a party. Thus, in *In re Engelhard & Sons Co.*, 231 U. S. 646, intervention was denied to a subscriber seeking to enter a suit between a municipality and a telephone utility involving the validity of the city's rate ordinance and the disposition of rate overcharges. Similarly, in *City of New York v. Consolidated Gas Co. of New York*, 253 U. S. 219, and *City of New York v. New York Telephone Co.*, 261 U. S. 312, the City of New York was not allowed to intervene on behalf of consumer residents of the city in litigation between state authorities and public utilities over the validity of state rate regulation. The wise principle of those decisions is reflected in many other federal cases decided both before and after the adoption of Rule 24 (a)(3).[15]

The applicability of this principle to intervention in antitrust suits brought by the Government was early

---

[15] *O'Connell v. Pacific Gas & Electric Co.*, 19 F. 2d 460 (C. A. 9th Cir.) (intervention denied to ratepayer protesting proposed settlement of litigation between utility and municipality); *Radford Iron Co. v. Appalachian Electric Power Co.*, 62 F. 2d 940 (C. A. 4th Cir.), cert. denied, 289 U. S. 748 (business injured by utility's proposed dam denied intervention in suit between utility and FPC); *MacDonald v. United States*, 119 F. 2d 821 (C. A. 9th Cir.), aff'd as modified, 315 U. S. 262 (intervention under Rule 24 denied in suit over mineral rights between United States and railroad to one claiming such rights under patent from United States); *Reich v. Webb*, 336 F. 2d 153 (C. A. 9th Cir.), cert. denied, 380 U. S. 915 (depositors denied 24 (a)(3) intervention in proceeding by Federal Home Loan Bank Board against savings and loan association officers); *Gross v. Missouri & A. Ry. Co.*, 74 F. Supp. 242 (D. C. W. D. Ark.) (24 (a)(3) intervention denied municipalities served by railroad involved in reorganization proceedings to which State was a party); *Butterworth v. Dempsey*, 229 F. Supp. 754, 798–799 (D. C. Conn.); aff'd, 378 U. S. 562 (intervention under 24 (a)(3) denied overrepresented towns in reapportionment suit brought against state authorities).

recognized by this Court. *Ex parte Leaf Tobacco Board,* 222 U. S. 578, denied intervention to enterprises that sold tobacco to defendants in an antitrust suit brought by the Government. From that time since, we have consistently refused to recognize the right to intervene in government antitrust suits.[16] *Allen Calculators, Inc.* v. *National Cash Register Co.,* 322 U. S. 137; *Partmar Corp.* v. *United States,* 338 U. S. 804; *Wometco Television & Theatre Co.* v. *United States,* 355 U. S. 40; *Westinghouse Broadcasting Co.* v. *United States,* 364 U. S. 518, dismissing appeal from 186 F. Supp. 776; *Sam Fox Publishing Co.* v. *United States, supra; Bardy* v. *United States,* 371 U. S. 576.[17] And we have upheld

---

[16] Intervention in this Court was allowed in *United States* v. *St. Louis Terminal,* 236 U. S. 194, but there the "intervenors" were in the practical status of defendants.

*Missouri-Kansas Pipe Line Co.* v. *United States,* 312 U. S. 502, relied upon by the Court, is completely inapposite. Panhandle Eastern Pipe Line Co. was a competitor of defendants charged by the Government with improperly exercising control over Panhandle to weaken its threat as a competitor. A consent decree was negotiated to protect Panhandle's independence. The decree provided for retention of jurisdiction by the court to enter such "further orders and decrees" as were necessary to carry out its purpose, and stated that "Panhandle Eastern, upon proper application, may become a party hereto" to protect its rights under the decree. When the Government later sought modifications of the decree, we held that the decree gave Panhandle the right to intervene. The Court carefully noted that this right to intervene was bottomed solely on the specific provisions of the decree and not general principles of intervention: "Its foundation is the consent decree. We are not here dealing with a conventional form of intervention . . . ." 312 U. S., at 506. The Court concluded, "Therefore, the codification of general doctrines of intervention contained in Rule 24 (a) does not touch our problem." 312 U. S., at 508.

[17] The policy behind these decisions was stated in *United States* v. *American Society of Composers, Authors and Publishers,* 341 F. 2d 1003 (C. A. 2d Cir.), cert. denied, 382 U. S. 877, in which ASCAP licensees were denied intervention to assert that ASCAP had violated

denial of intervention to a private party who claimed that a decree negotiated between the Government and an antitrust defendant failed to carry out the mandate of this Court. *Ball* v. *United States,* 338 U. S. 802.

The results which follow from the Court's rejection of the practical wisdom embodied in these decisions are apparent. There were over 20 applications to intervene in the decree proceedings below. The Court's construction of 24 (a)(3) would require the District Court to grant most if not all of them. El Paso gas goes to millions of consumers, and under the Court's decision any or all of them are entitled to intervene as of right. And there is nothing in the Court's opinion which suggests that this right to intervene is limited to litigation over remedy. If consumers and others have an interest in making sure that a government antitrust decree meets their standards of effectiveness, they have an even greater interest in insuring that a violation is found. Thus the Court's reasoning gives any consumer a right to intervene in government antitrust litigation at the very outset. The Court invites a scope of intervention that will make the delays in this case seem mercifully short.

The Court's decision would not be of such concern, nor merit so much discussion, if it were simply limited to 24 (a)(3), a provision which has been superseded. But the same approach which creates a right to intervene for California and the Southern California Edison Co. under the old Rule 24 (a)(3) appears in the Court's construction of the new Rule 24, under which it says Cascade has a right to intervene. The new Rule 24 (a)(2)

---

a decree in an antitrust suit brought by the Government: "The United States in instituting antitrust litigation seeks. to vindicate the public interest and, in so doing, requires continuing control over the suit . . . ." 341 F. 2d, at 1008.

replaces the previous Rule 24 (a)(2) and (3), and provides for intervention of right:

> "[W]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

This and other amendments to the Federal Rules of Civil Procedure were promulgated by this Court to "take effect on July 1, 1966, and . . . govern all proceedings in actions brought thereafter and also in all further proceedings in actions then pending . . . ." 383 U. S. 1031. Since the District Court denied Cascade's motion to intervene in 1965, before the effective date of the amended Rule, the new Rule was inapplicable to Cascade's motion.[18] But even if the new Rule were applicable, neither Cascade nor the other appellants could claim intervention of right under it.

The purpose of the revision was to remedy certain logical shortcomings in the construction of the former 24 (a)(2), see *Sam Fox Publishing Co.* v. *United States, supra,* and to give recognition to decisions such as

---

[18] In *Klapprott* v. *United States,* 335 U. S. 601, the petitioner sought to reopen a default judgment denaturalizing him, relying on amendments to Rule 60 (b). Several Justices thought that the petitioner should be able to obtain relief under the amended Rule even though the District Court had denied the petitioner's application before the effective date of the amendments. Cascade's interest here bears no resemblance to the extraordinary hardship and injustice claimed by the petitioner in *Klapprott,* where it could be persuasively argued that it was "more consonant with equitable considerations to judge the case on the basis of the Rule now in force, even though the lower court did not have the opportunity to apply it." 335 U. S., at 629 (dissenting opinion).

*Formulabs, Inc.* v. *Hartley Pen Co., supra,* which had expanded intervention under the former 24(a)(3) beyond the strict *pro interesse suo* model it embodied.[19] But an applicant is still required to have an "interest" in the litigation sufficiently direct and immediate to justify his entry as a matter of right. The remote and general concerns that appellants State of California and Southern California Edison Co. have with this government suit have already been discussed. And Cascade's interest is even more insubstantial. While it purchases gas from El Paso in Oregon, it seeks intervention to vindicate gas competition in California.[20] Even if it should be thought that the amended Rule might encompass such remote interests in some conceivable circumstances, it is clear that such interests may never justify intervention of right in public antitrust litigation, where Congress has carefully entrusted the conduct of government suits to the "direction of the Attorney General." But even if Cascade should pass this hurdle, it would also have to show that there was a failure of "adequate representation" by the Justice Department in this case.

The Court states that the Government "knuckled under to El Paso" and has "fallen far short of representing" Cascade's interest. Since the interest that Cascade claims to be representing is that of the public, the Court is charging the Justice Department with dereliction of duty or serious incompetence. I regard this charge as wholly unjustified. The Government did settle for less than all the relief that it sought at the outset. But this is a wholly familiar phenomenon of negotiation. Bar-

---

[19] See Notes of Advisory Committee on Rules, Fed. Rule Civ. Proc. 24, 28 U. S. C. App. Rule 24 (1964 ed., Supp. II).

[20] The FPC will protect Cascade's existing supply of gas when New Company applies for certification. See, *e. g., Michigan Consolidated Gas Co.* v. *FPC,* 108 U. S. App. D. C. 409, 283 F. 2d 204, cert. denied, 364 U. S. 913.

gaining for consent decrees and stipulated remedies is a normal and necessary element in the Government's enforcement of the antitrust laws. Moreover, it is perfectly conceivable that in the course of negotiations the Government may become aware of errors in its opening position. If, as the Court's opinion seems to suggest, the Government is required to press its original negotiating position unceasingly and to the bitter end, the number of cases which the Government can afford to undertake will be sharply reduced, and the enforcement of the antitrust laws will ultimately become less effective. And of course the delay in antitrust litigation, which so concerns the Court, will markedly increase.

The Court's standard of "adequate representation" comes down to this: If, after the existing parties have settled a case or pursued litigation to the end, some volunteer comes along who disagrees with the parties' assessment of the issues or the way they have pursued their respective interests, intervention must be granted to that volunteer as of right. This strange standard is not only unprecedented and unwise, it is also unworkable.

The requirement of inadequate representation by existing parties as a precondition of the right to intervene under the new Rule 24 is obviously an adaptation of the similar standard contained in the former 24 (a) (2). Decisions under that standard allowed intervention of right when the intervenor could show a conflict of interest between himself and the party supposed to represent his interest,[21] a complete failure of representation by existing parties,[22] or collusion or the likelihood of collusion be-

---

[21] *Pyle-National Co.* v. *Amos,* 172 F. 2d 425 (C. A. 7th Cir.); *Mack* v. *Passaic Nat. Bank & Trust Co.,* 150 F. 2d 474, 154 F. 2d 907 (C. A. 3d Cir.); *In re Standard Power & Light Corp.,* 48 F. Supp. 716 (D. C. Del.).

[22] *Pellegrino* v. *Nesbit,* 203 F. 2d 463 (C. A. 9th Cir.).

156

tween them.[23] Mere tactical disagreement over how litigation should be conducted is obviously insufficient to support intervention of right.[24] In ignoring these precedents, the Court also overlooks the sound policies which underlie them. The Court's approach draws judges into the adversary arena and forces them into the impossible position of trying to second-guess the parties in the pursuit of their own interests. It is also wasteful and productive of delay, because under this strange standard a person's right to intervene in litigation cannot be ascertained until that litigation is concluded and the existing parties' conduct evaluated.

Wrong as the Court's approach is with respect to litigation generally, it is even more wrong when a would-be intervenor seeks to challenge the adequacy of the Government's representation of the public interest. The separation of powers in our federal system generates principles that make it peculiarly inappropriate for courts to assume the role of supervision over policy decisions of the Executive. Yet the Court presumes to tell the Justice Department that it made tactical errors in conducting litigation, failed in its assessment of the public interest, and cannot settle a lawsuit which it has brought. This Court does not have the constitutional power to second-

---

[23] *Cuthill* v. *Ortman-Miller Machine Co.,* 216 F. 2d 336 (C. A. 7th Cir.); *Park & Tilford, Inc.* v. *Schulte,* 160 F. 2d 984 (C. A. 2d Cir.), cert. denied, 332 U. S. 761; *Klein* v. *Nu-Way Shoe Co.,* 136 F. 2d 986 (C. A. 2d Cir.); *Molybdenum Corp. of America* v. *International Mining Corp.,* 32 F. R. D. 415 (D. C. S. D. N. Y.); *Twentieth Century-Fox Film Corp.* v. *Jenkins,* 7 F. R. D. 197 (D. C. S. D. N. Y.).

[24] *Alleghany Corp.* v. *Kirby,* 344 F. 2d 571 (C. A. 2d Cir.), cert. dismissed, 384 U. S. 28; *Stadin* v. *Union Electric Co.,* 309 F. 2d 912 (C. A. 8th Cir.), cert. denied, 373 U. S. 915; *United States* v. *American Society of Composers, Authors and Publishers,* 202 F. Supp. 340 (D. C. S. D. N. Y.). But cf. *Ford Motor Co.* v. *Bisanz Bros.,* 249 F. 2d 22 (C. A. 8th Cir.).

guess decisions of the Attorney General made within the bounds of his official discretion. That is the responsibility of the President and, ultimately, the electorate. In words appropriate here, we long ago stated in the context of an attack on the Government's settlement of an antitrust case: ". . . we do not find in the statutes defining the powers and duties of the Attorney General any such limitation on the exercise of his discretion as this contention involves. His authority to make determinations includes the power to make erroneous decisions as well as correct ones." *Swift & Co.* v. *United States,* 276 U. S. 311, 331–332. The Court today gives only lip service to these principles. It states that "We do not question the authority of the Attorney General to settle suits after, as well as before, they reach here." *Ante,* at 136. But it then proceeds to take the direction of a government lawsuit out of the hands of the Attorney General and into its own.

The Court relies on the fact that we have previously rendered a judgment in this case and cites dictum from the opinion in *United States* v. *E. I. du Pont & Co.,* 366 U. S. 316, to justify the extraordinary course it takes. But in the absence of outright fraud, it has never been thought that the fact that parties have initially resorted to the courts gives judges power to set aside later settlement agreements and impose others on the parties. And certainly when it is the Executive Branch of the Government that has made the settlement as representative of the public interest, only the grossest bad faith or malfeasance on its part could possibly support such a step. Either the Court is saying the Government was guilty of such misconduct—a charge totally without support in the record—or the Court has grossly overreached the permissible limit of judicial power.

Not only concern for the constitutional position of this Court, but more directly pragmatic considerations

underlie my disagreement with today's decision. To permit volunteers to intervene and second-guess the Justice Department is especially inappropriate when the issues involved, like those in the antitrust field, require technical experience and an assessment and balancing of interests essentially administrative and political. Formulation of effective and consistent government antitrust policy is unlikely to result from "piecemeal intervention of a multitude of individual complainants" [25] in litigation brought by the Government. Less than six years ago we fully recognized this principle:

> ". . . sound policy would strongly lead us to decline [the] invitation to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." *Sam Fox Publishing Co.* v. *United States, supra*, at 689.[26]

Today the Court ignores all this and grants intervention of right to any volunteer claiming to speak for the public interest whenever he can convince a court that the Government might have used bad judgment in conducting or settling a lawsuit. I think this decision, which undermines the Justice Department in the discharge of its responsibilities, and invites obstruction and

[25] *United States* v. *General Electric Co.*, 95 F. Supp. 165, 169 (D. C. N. J.).

[26] This policy has been given continuing recognition by the lower federal courts. *Reich* v. *Webb*, 336 F. 2d 153 (C. A. 9th Cir.), cert. denied, 380 U. S. 915; *MacDonald* v. *United States*, 119 F. 2d 821 (C. A. 9th Cir.), aff'd as modified, 315 U. S. 262; *United States* v. *General Electric Co.*, 95 F. Supp. 165 (D. C. N. J.). See *Wometco Television & Theatre Co.* v. *United States*, 355 U. S. 40. But cf. *Atlantic Refining Co.* v. *Standard Oil Co.*, 113 U. S. App. D. C. 20, 304 F. 2d 387.

delay in the course of public litigation, is unsupported by the provision of old Rule 24, new Rule 24, or any other conceivably tolerable standard governing intervention as of right. The District Court did not err in denying intervention to the appellants,[27] and these appeals should therefore be dismissed.[28]

But even if I am completely wrong, and the Court is right in concluding that the District Court erred in denying appellants the right to intervene, the proper course would be simply to remand the case to the District Court so that the appellants' contentions may be met by the Government or El Paso and passed on by a trial court that is intimately familiar with the massive record in this case. Instead, the Court brushes aside the "threshold" question of appellants' right to intervene in a few pages and devotes most of its opinion to pronouncements on gas reserves, delivery contracts, and other intricacies of gas competition in the western United States. These issues were never the subject of adversary proceedings in the District Court. They were never resolved through findings by the District Court. Appellees did not directly brief or argue them before this Court. On the basis of what are in effect *ex parte* criticisms of the decree entered below, the Court lays down "guidelines" with respect to complex issues which will shape the future of an important segment of this Na-

---

[27] The appellants also seek to challenge the District Court's denial of their motions for permissive intervention under Rule 24 (b). We have no jurisdiction to consider this challenge. *Allen Calculators, Inc.* v. *National Cash Register Co.*, 322 U. S. 137. See *Sam Fox Publishing Co.* v. *United States*, 366 U. S. 683, at 688 and n. 3. And in any event the District Court did not, in the circumstances of this protracted and complex litigation, abuse its discretion in choosing to allow appellants to present their views by *amicus* briefs rather than affording them permissive intervention as full parties.

[28] See *Sutphen Estates, Inc.* v. *United States*, 342 U. S. 19.

tion's commerce. In so doing the Court roams at large, unconfined by anything so mundane as a factual record developed in adversary proceedings.

> "The obvious must be restated. We do not sit to draft antitrust decrees *de novo*. This is a court of appeal, not a trial court. We do not see the witnesses, sift the evidence in detail, or appraise the course of extended argument . . . . In short, this Court does not partake of the procedure and is not charged with the responsibility demanded of the court entrusted with the task of devising the details of a decree appropriate for the governance of a vastly complicated situation arising out of unique circumstances." *United States* v. *E. I. du Pont & Co.*, 366 U. S. 316, 371 (dissenting opinion).

The Court has decided this case on little more than repugnance for "the attitude or philosophy of the District Court" and the unjustified and extraordinarily opprobrious conclusion that the Government "knuckled under." This is not a happy foundation for radical extensions of intervention doctrine. And it is not a proper basis for deciding how stock in the New Company should be marketed, or how gas reserves in New Mexico should be divided. In its zeal to censure the District Judge and reprimand the Justice Department, the Court has rushed headlong into a jurisprudential quagmire far more dangerous than the "evil" it purports to discern in the decree entered by the trial court.

Finally, I must note my emphatic disagreement with the Court's extraordinary action in directing that further proceedings in this case must be conducted by a different district judge. Federal reviewing courts have taken this serious step only in the rarest circumstances, when the trial judge's personal or emotional involvement in a case has been demonstrated. See *Offutt* v. *United States*, 348

U. S. 11; *Cooke* v. *United States,* 267 U. S. 517; *Occidental Petroleum Corp.* v. *Chandler,* 303 F. 2d 55 (C. A. 10th Cir.), cert. denied, 372 U. S. 915. No such involvement by the District Judge in this case is remotely suggested by the record. Nobody has requested his replacement at any stage of the proceedings. For this Court, on its own motion, to disqualify a trial judge in the middle of a case because it disagrees with his "philosophy" is not only unprecedented, but incredible.