**UNITED STATES of America,**
**Plaintiff,**

**Boehringer Ingelheim G.m.b.H.,**
**Intervenor,**

**Spray-Rite Service Corporation,**
**Intervenor,**

**v.**

**CIBA CORPORATION et al., Defendants.**

**No. 70 Civ. 3078.**

United States District Court,
S. D. New York.

Sept. 8, 1970.

508

Norman H. Seidler, U. S. Dept. of Justice, for plaintiff; Lewis Bernstein, Washington, D. C., James C. Schultz, Hauppauge, N. Y., of counsel.

Royall, Koegel & Wells, New York City, for Boehringer Ingelheim G.m.b.H.

Lord, Day & Lord, New York City, for Spray-Rite Service Corp.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for Ciba Corp. and Ciba Ltd.

Cravath, Swaine & Moore, New York City, for Geigy Chemical Corp., J. R. Geigy, S. A. and Geigy International A. G.

## OPINION

FRANKEL, District Judge.

On July 17, 1970, the United States filed its complaint herein against J. R. Geigy, S. A., a Swiss corporation; its wholly-owned Swiss subsidiary, Geigy

International A. G.; Geigy Chemical Corporation, a New York company owned entirely by the Swiss subsidiary; CIBA Limited, another Swiss corporation; and CIBA Corporation, which exists under Delaware law and is wholly owned (at least in substance) by the similarly named Swiss enterprise. The complaint alleged that there were impending merger arrangements between the two Swiss companies; that this would lead to acquisition by a single corporation of "the whole or part of the stock or assets of either * * * or both" of the American companies; and that "the effect of such acquisition may be substantially to lessen competition throughout the country" in specified areas of commerce. There was a prayer to enjoin any such acquisition and to declare it a violation of Section 7 of the Clayton Act. Along with the complaint, however, the parties filed a stipulation and proposed consent decree, agreeing that the latter could be "filed and entered" by the court at any time after 30 days following July 17, provided plaintiff's consent was not withdrawn during those 30 days. The 30-day period and provision for possible withdrawal of consent contemplated effectuation of the Department of Justice policy, 28 C.F.R. § 50.1, allowing interested third parties to submit comments and objections that might lead the Department to change its position.

Two objectors, Spray-Rite Service Corporation and Boehringer Ingelheim G.m.b.H., did appear, but their protests did not result in the withdrawal of the Government's consent. They have now come to this court (1) seeking intervention under Fed.R.Civ.P. 24 either as of right or in discretion and (2) urging that the court deny its approval of the proposed decree. The court has heard oral argument and studied the impressive pile of papers swiftly built by counsel. For reasons briefly outlined below, both applications to intervene will be denied and the consent decree will be signed.

1. To describe it in somewhat greater detail, the complaint alleges that in 1968 the American CIBA (hereinafter simply "CIBA") had United States sales of $143 million or 23% of the total world-wide sales of "all companies in the CIBA LIMITED family." The American Geigy (hereinafter "Geigy") is alleged to have had 1968 sales totalling $280 million, equalling about 45% of the total world-wide sales "for all companies in the J.R.Geigy, S.A., family." The complaint goes on to describe the particular product areas which the proposed merger will affect.

The first is dyestuffs. The complaint states that Toms River Chemical Corporation, organized in Delaware and having its principal place of business in Toms River, New Jersey, is owned 58% by CIBA and 21% by Geigy. The remainder of the Toms River common stock is said to be beneficially owned by a Swiss company, Sandoz, Ltd. The Toms River Corporation, says the complaint, manufactures dyestuffs exclusively for CIBA, Geigy and a New York subsidiary of Sandoz. Both CIBA and Geigy purchase about 60% of their requirements from Toms River. The remainder of their resale requirements is obtained from their Swiss parents and other domestic manufacturers. The complaint goes on to allege that in a total United States dyestuff sales market approaching $300,000,000, CIBA's and Geigy's shares were approximately 7.7% and 10.3% respectively. These two are asserted to be among the eight largest sellers, who together account for about 65% of the market.

The complaint then proceeds to optical brightening agents, which are used principally to brighten white color. These products ("OBAs") are sold mainly to laundry products manufacturers (about 65%) and to the textile industry (about 20%). It is alleged that about 90%

of OBAs sold to the laundry products industry are for use in detergents; that in 1968 such sales approximated $32,000,000; that Geigy accounted for about 50% of the total and CIBA for about 6%. OBA sales to the textile industry in 1968 totalled approximately $12,500,000, of which Geigy accounted for some 10% and CIBA for 19%.

Ethical pharmaceuticals are the next of the complaint's subjects. Specifically, the allegations here deal with oral diuretics and certain combination drugs described as "Rauwolfia-diuretics." Again the substantial market shares of CIBA and Geigy are described; it is noted that CIBA in 1968 was the second largest seller of Rauwolfia-diuretics; Geigy is stated to have been the sixth largest seller; and it is alleged that the top eight companies accounted for about 97% of sales in that year.

Finally, the complaint deals with herbicides. It is stated that Geigy in 1968 accounted for about 25% of total United States herbicide sales and that CIBA entered this business only in 1962, thus accounting for a much smaller market share by 1968.

The concern of the complaint is said to be the threatened elimination of competition between CIBA and Geigy in the manufacture and/or sale of the foregoing products as a result of the acquisition of the stock by both of them by a single company.

The proposed consent decree, containing fairly customary recitations that nothing is admitted and nothing has been proved, does not achieve the kind of total prohibition against a merger sought in the complaint. On the other hand, it does provide for substantial and detailed remedial measures to avoid the major evils threatened according to the complaint. For present purposes the lengthy and detailed provisions of the decree are sufficiently summarized in broad and brief outline. Provision is made for the establishment of a new corporation by the Swiss CIBA and Swiss Geigy corporations, the new creature being referred to, aptly enough, as the "New Company." The New Company is to acquire CIBA's dyestuff business (including personnel, inventories, offices and other facilities). Provision is made for this company's acquisition of a continuing supply of dyestuffs for a period of years. It is to be given the technical information and manufacturing know-how to enable it to produce dyestuffs for itself. It is to be given licenses under domestic patents held by the defendants on reasonable royalty terms. It is, in short, to be equipped in a variety of respects as a new factor in the competitive market for sales of dyestuffs.

The New Company is also to acquire the detergent OBA business of CIBA. CIBA is to transfer to the New Company two patents and a patent application relating to OBAs, reserving a non-exclusive royalty-free license to itself; a non-exclusive, royalty-free license under three other patents; the exclusive right to use of a trademark; manufacturing know-how with regard to two detergent OBAs; detergent OBA accounts receivable, orders in process and customer contracts.

As to pharmaceuticals, the decree requires that the two Swiss corporations, within two years from the date of their merger, must "sell to a single Eligible Purchaser" an array of listed "pharmaceutical assets." These include a variety of Geigy pharmaceutical patents, two Geigy trademarks, all of the merged companies' "right, title, interest and privileges" with respect to certain FDA materials; and manufacturing know-how, technical information and customer lists and sales records. In addition, the defendants are to sell to the purchaser of the pharmaceutical assets, or procure for the purchaser, the active ingredients for, or formulations of, the pharmaceutical products to which the decree relates, this requirement to continue for five years from the date of the sale. The purchaser is also to receive an option, valid for

a period of four years, for the purchase of a Geigy plant manufacturing pharmaceutical products. Other provisions concerning pharmaceuticals relate to the supplying of personnel to the purchaser of the pharmaceutical assets, the granting of certain co-manufacturing rights, and clauses protecting the purchaser against the recapture of personnel acquired by the purchaser under the terms of the decree.

As in the preceding situations, the decree does not require complete divestiture of herbicide assets the merged enterprise acquires, but it does require the grant to an "Eligible Purchaser" of licenses on reasonable royalties to certain CIBA herbicide patents. There is again provision for the transfer to such purchaser of know-how, technical information, and access to FDA material. The purchaser is to be supplied with basic compounds, customer lists and sales records. Personnel are to be made available to the purchaser, again with a prohibition against recapture for a period of three years. Finally, the purchaser is to acquire an option to purchase certain CIBA agrochemical testing facilities.

Omitting numerous other details, we note that the decree calls for reports quarter-annually to the Assistant Attorney General in charge of the Antitrust Division concerning the steps taken to achieve compliance. The defendants are forbidden to make any acquisitions of businesses in their lines of commerce except upon prior notice to the government, and subject to the right of the government to demand information concerning the proposed transaction, with a period of delay to follow the supplying of such information before any acquisition may be consummated. Provision is made for examination of records by Department of Justice personnel in connection with the transactions involved, the submission of reports upon request from the Assistant Attorney General, and, of course, the retention of jurisdiction by the court

for further actions or modifications that the course of future events may require.

2. We come to the two applicants seeking to intervene and to oppose the consent decree. Spray-Rite Service Corporation is a distributor of herbicides in the "Corn Belt." Its president, Donald E. Yapp, makes an affidavit as the factual basis for intervention stating that the proposed merger "will substantially foreclose competition between two major research-orientated [sic] institutions in the herbicide industry;" that 90% of Geigy's sales in the Corn Belt are of Atrazine, and 90% of Spray-Rite's gross yearly sales ($5,000,000) are of the same product, which Spray-Rite buys for resale from Geigy. CIBA, he says, is "research-orientated" [sic], as are Geigy and a few other companies. Entry of the proposed final judgment will lead to "a foreclosure of independent research and development efforts of Ciba for herbicides in the Corn Belt." Also, he predicts, "price competition will be adversely affected." He says intervention by his Company should be allowed so that it may "conduct discovery proceedings to further develop the basic facts and the impact of the proposed merger * * *." He states that Spray-Rite a year ago "contacted the defendant Ciba Corporation requesting that Spray-Rite become a Ciba pesticide distributor, but Ciba refused to accede to this request. No reason for this denial was given!"

Mr. Yapp also reports one or two conversations abroad on which he then presents his "opinion that Geigy is seeking to gain control through acquisitions * * * of the world sources of cynuric chloride," a basic ingredient of Atrazine and other triazines.

Finally, Mr. Yapp states: "I make this motion primarily as a public-spirited citizen, and in the firm belief that this acquisition is not in the public interest."

A number of Mr. Yapp's factual assertions are disputed, but there is no need

in the court's view to resolve such differences now.

As for Boehringer, a German corporation, its concerns are more distinctly and narrowly "private." This manufacturer and seller of pharmaceutical products recounts its interest in the United States market and its inability thus far to make a "direct entry" here. It describes its contractual arrangements with Geigy for the latter's manufacture and distribution of Boehringer products in the United States. It says it "regarded the Agreement as a prelude to its own direct entry into the American pharmaceutical market" after the end of 1976, when its licenses to Geigy may under the contract be terminated.

In addition to patent and trademark licenses, Geigy receives from Boehringer a fund of secret information implementing Geigy's rights to make and sell the affected products. The impending merger, Boehringer complains, will expose such secrets to the Swiss CIBA, a major competitor.

Boehringer also asserts that the merger and proposed consent decree will permit the suppression of actual competition in appetite suppressants and anti-hypertensives. In addition, it is said, potential competition will suffer because the Boehringer-Geigy arrangements can no longer undergo anticipated expansion when the prohibitive cost will be further exposure of Boehringer secrets to CIBA. Other potential consequences of a more minor nature are added to the predicted evils of the consent decree.

Both of the applicants for intervention rely, understandably but in vain, upon Cascade Nat. Gas v. El Paso Nat. Gas,

386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967). The special facts of that case, as highlighted in subsequent decisions, make it an inapposite precedent here.

However difficult it is to link with the literal terms of Fed.R.Civ.P. 24(a),[1] the fact that a mandate of the Supreme Court had been disregarded was a matter of consequence in *Cascade*. A string of later decisions, sustained by the Supreme Court, have made this reasonably clear. United States v. Automobile Mfrs. Ass'n, 307 F.Supp. 617 (C.D.Cal.1969), aff'd per curiam sub nom. City of New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970); United States v. Blue Chip Stamp Co., 272 F. Supp. 432 (C.D.Cal.1967), aff'd per curiam sub nom. Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968); United States v. Western Electric Co., 1968 Trade Cas. ¶ 72,415 (D.N.J.), aff'd per curiam sub nom. Clark Walter & Sons, Inc. v. United States, 392 U.S. 659, 88 S.Ct. 2286, 20 L.Ed.2d 1348 (1968); United States v. Aluminum Co. of America, 41 F.R.D. 342 (E.D.Mo.), appeal dismissed per curiam sub nom. Lupton Mfg. Co. v. United States, 388 U.S. 457, 87 S.Ct. 2112, 18 L.Ed.2d 1318 (1967). Conjoined with that fairly unique feature was the basic principle of *Cascade* that the first party allowed intervention, the State of California, had an interest not merely "at the heart of the controversy," but "at the heart of [the] mandate" which the Court found to have been violated by the lower court and neglected by the United States as plaintiff.[2]

---

1. "*Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

2. Whether the interests of the other intervenors were equally central is open to debate. Once the door was opened, however, the details about further entrants may have been deemed matters of less than prime consequence.

It seems apparent from *Cascade* and other cases that the interest justifying intervention as of right in an antitrust suit brought by the United States must be substantial, must lie at the center of the controversy, and must be shown clearly, in the language of the Rule, to be less than "adequately represented" by the Department of Justice. This would appear to harmonize fairly the procedural aims of the Rule and the perhaps more fundamental principles governing the role of the Attorney General of the United States in representing the "public interest" in federal antitrust proceedings. With this set of criteria, there is no essential conflict between the many cases confiding representation of the public exclusively to the Attorney General, e. g., Sam Fox Publishing Co. v. United States, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961); United States v. Borden Co., 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954); Buckeye Coal & R. Co. v. Hocking Valley Co., 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155 (1925); United States v. Blue Chip Stamp Co., 272 F.Supp. 432 (C.D.Cal. 1967), aff'd per curiam sub nom. Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968), and the relatively rare instances in which other parties have been permitted to intrude. So, for example, in *Cascade*, the government was taxed with having "knuckled under" (386 U.S. at 141, 87 S.Ct. 932), and in United States v. First Nat'l Bank and Trust Co. of Lexington, 280 F.Supp. 260, 263 (D.Ky. 1967), aff'd per curiam sub nom. Central Bank and Trust Co. v. United States, 391 U.S. 469, 88 S.Ct. 1845, 20 L.Ed.2d 749 (1968), the trial court found "about a ninety per cent capitulation" by the government. Such are the infrequent occasions when the coincidence of private and public interests may permit a private party in effect to interfere with or displace the normal official representatives of the public.

Whether or not the tentative formulation in the preceding paragraph is fully acceptable, neither applicant here presents a powerful case. Spray-Rite proceeds mostly upon predictions, rumor and speculation rather than upon direct and visible injury to itself from the conduct it questions. Granting the flexibility of figurative language, it would be a wild exaggeration to describe what this movant shows as an interest anywhere near "the heart" of the case. Indeed, Spray-Rite indicates in the end its essential ground for being here is the view, in its president's words, that "somebody sometime has to look out for the interests of the people."

Boehringer's case, though different, is hardly stronger. The crux of this movant's concern is an array of special interests arising out of its unique contractual arrangements with Geigy. Boehringer's contractual rights will, of course, be unaffected by the consent decree. United States v. Carter Products, Inc., 211 F. Supp. 144 (S.D.N.Y.1962). It appears, moreover, that the settlement of these interests, peculiar to Boehringer, would leave this movant entirely agreeable to the allegedly anti-competitive effects about which it claims a desire to intervene and litigate.

Finally, and importantly, despite the few criticisms to which the consent decree is subjected, there is nothing here to suggest that the public interest has not been fairly, vigorously and faithfully represented by the Attorney General and his staff. The submissions now before the court reflect a thorough and sophisticated appraisal of the many interests at stake, the problems, the possible pitfalls, the litigation odds—in short, a far more spacious and rounded analysis than either movant pretends to offer.

Of course, there should be no pretense that a district judge, confronted with situations like this one, is able to reach detailed judgments on the merits. The court in such a situation—short of com-

pelling the trial a consent decree avoids[3]—must proceed in some degree upon faith in the competence and integrity of government counsel. But this is scarcely an alarming necessity. At the least, we may acknowledge that all is lost unless such confidence may be reposed safely on a host of occasions.

■■ Having concluded that neither movant makes out a case for intervention as a matter of right under Rule 24(a), the court reaches quickly a similar decision on the alternative of permissive intervention under the Rule's subdivision (b).[4] The critical judgment now made is that the consent decree is a proper disposition. The prolongation of the suit has not been shown by either movant to be desirable or justifiable. Absent such a showing, in an antitrust case brought by the United States, continuation of the litigation becomes by definition a course that "will unduly delay or prejudice the adjudication of the rights of the original parties." Rule 24(b).

3. Those supporting the decree as well as those opposed to it join in solemn assurances that the court is not viewed as a "rubber stamp" when presented with an elaborate consent decree in a complex case like this one. This leaves the reality, already acknowledged, that the court's time, talents and resources for intensive scrutiny are severely limited. What, then, is the actual scope of the court's powers and obligations?

The question may have a variety of answers. For the instant case, the presence of applicants for intervention, while their motions have been denied, has proved enlightening and reassuring. In fact, counsel for Spray-Rite, before making the formal motion to intervene, made an offer, accepted by the court, to supply as *amicus* a critique of the proposed decree. That submission and the comparable work for Boehringer have been studied, and the court is grateful for them. The familiar sounds of adversaries carry a substantial hope, if no certainty, that errors of the most grievous variety have been avoided.

■ What comes out of the competing views may be summarized in a few words. As has been indicated, the decree falls short of the relief originally sought, but it goes a long way toward the competitive situation at which the government's efforts have been aimed. The decree is, after all, a *settlement*. It accomplishes assured and immediate results without proof of the contentions in the complaint, which proof nobody suggests would necessarily be sufficient. Nobody suggests, either, that there has been "capitulation" or "knuckling under" or any semblance of bad faith on the part of anyone. There is, in sum, ample ground for finding in the judgment a sound compromise achieved by government counsel with undivided loyalty and effective attention to the public interest.

Accordingly, the consent decree is today being signed.

3. A procedure, as everyone knows, indispensable to the handling of the government's (and the courts') antitrust business.

4. *"Permissive Intervention.* Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."