**UNITED STATES of America**

v.

**INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION and the Hartford Fire Insurance Company.**

**Civ. No. 13320.**

United States District Court,
D. Connecticut.

Sept. 6, 1972.

Raymond M. Carlson, William H. Rowan, Samuel Karp, Department of Justice, Antitrust Division, Washington, D. C., Stewart H. Jones, U. S. Atty., New Haven, Conn., for plaintiff.

Joseph P. Cooney, Cooney & Scully, Hartford, Conn., John H. Schafer, III, Henry P. Sailer, Covington & Burling, Washington, D. C., for defendants.

Bruce Mayor, Dwight Schweitzer, Hartford, Conn., for prospective intervenors.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

On September 24, 1971, a final judgment was entered in this case with the consent of the parties. Now Ralph Nader and Reuben B. Robertson, III, hitherto amici curiae, have moved to intervene in the instant case for the limited purpose of moving the court to set that judgment aside on the ground that it was obtained by "fraud . . ., misrepresentation, or other misconduct of an adverse party." Fed.R.Civ.P. 60(b) (3).

### I.

#### Prior Proceedings

The prior proceedings in the instant case have been complex and extensive. Although the only judgment which the prospective intervenors seek to challenge is the one entered in the instant case, this case is one of three antitrust suits instituted by the government in 1969 against ITT seeking to undo or prevent mergers of ITT with other corporations.

The first of these suits, which was brought on April 28, 1969, in the district court for the Northern District of Illinois, attacked the recently consummated merger of ITT and the Canteen Corporation (Canteen) as violative of Section 7 of the Clayton Act, 15 U.S.C. § 18.[1] Subsequently, on August 1, 1969, the government filed two separate complaints in this court, charging respectively that the then proposed merger of the Grinnell Corporation (Grinnell) and with the Hartford Fire Insurance Company (Hartford) also violated Section 7.

Following extensive evidentiary hearings, the government's motions for preliminary injunctions enjoining the Hartford and Grinnell acquisitions were denied by Judge William H. Timbers (now Circuit Court of Appeals Judge) on the ground that the government had not shown a probability of success on the merits. United States v. International Telephone & Telegraph Corp., 306 F. Supp. 766 (D.Conn.1969). Thereafter, the Grinnell and Canteen cases were tried on the merits. In both, the claims of the government were decisively rejected. United States v. International Telephone & Telegraph Corp., 324 F. Supp. 19 (D.Conn.1970); United States v. International Telephone & Telegraph Corp., 1971 Trade Cases, para. 73,619 (N.D.Ill.1971).

On August 10, 1971, before trial of the Hartford case and when the government's appeal in the Grinnell case was pending, and its time to appeal from the judgment of the district court in the Canteen case had not yet expired, the parties presented to this court proposed consent judgments in Hartford and Grinnell and presented to the Illinois district court a proposed consent judgment in Canteen. The three judgments, as counsel for the government informed this court, were "negotiated jointly," "intertwined" and "interdependent." Transcript of Hearing of August 10, 1971, at 15. On September 24, 1971, following a hearing held on September 23, this court entered the consent judgments in Grinnell and Hartford. 1971 Trade Cases, para. 73,665–6 (D.Conn.1971). On the same day, the district court for the Northern District of Illinois entered the consent judgment in Canteen.

■ With respect to the judgments entered in this court, the court stated:

"(T)hey are carefully tailored to eliminate the aspects of the acquisition which the original complaints alleged to be illegal. Within the limits of the existing statutory law and judicial power, the provisions of the proposed decrees constitute a commendable effort toward safeguarding the public interest." United States v. International Telephone & Telegraph Corp., Civ.Nos. 13,319, 13,320, Order on Motion for Entry of Final Judgment (D. Conn., Sept. 24, 1971).

Epitomized in that conclusion was the court's analysis of the proposed decrees.[2]

1. 15 U.S.C. § 18 in relevant part provides:
"Acquisition by one corporation of stock of another
"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

2. The role of the court in passing upon an application for approval of a consent decree is "to decide whether it is equitable to enter the decree as proposed." United States v. Carter Products, Inc., 211 F.Supp. 144, 147 (S.D.N.Y.1962). As stated in United States v. Automobile Mfgrs. Ass'n, 307 F.Supp. 617, 621 (C.D. Calif.1969), aff'd per curiam sub nom. City of New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970):

"(T)he court should withhold its approval if the decree be unenforceable or if it should provide for relief not consistent with the prayer of the complaint. The court may properly consider whether or not the rights of persons not parties to the action are jeopardized and whether the consent de-

■ The court, having satisfied itself as to the adequacy of the consent decree in the Hartford case did not inquire into the Justice Department's "motives" or reasons for negotiating a settlement and accepting the proposed decree. As the United States Supreme Court has stated in Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689, 81 S.Ct. 1309, 1312–1313, 6 L.Ed.2d 604 (1961):

> "sound policy would strongly lead . . . (the Court) to decline . . . (an) invitation to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting."

See United States v. Automobile Mfgrs. Ass'n, *supra,* 307 F.Supp. at 620.

## II.

### *Motion to Intervene*

To support their motion, the movants invoke Fed.R.Civ.P. 24(a)(2) which permits intervention by non-parties:

> "when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical mat-

ter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

The movants do not claim to have a property interest in the Hartford-ITT merger;[3] they do not seek damages. Rather, they claim to represent the "public interest;" they state that the "interests which applicants are asserting here are those of representatives of the public who desire to see that the antitrust laws are enforced." Concomitantly, the movants claim that, although the primary responsibility for representing the public interest lies with the Justice Department, acting on behalf of the United States, in this case the Justice Department has failed to adequately carry out its responsibility.

■ The movants rely heavily on the holding of the Supreme Court in Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 135, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), that the State of California had a sufficient interest in competition among suppliers to raise the question of whether the district court had fully complied with a previous mandate of the Supreme Court directing divestiture. See United States v. El Paso Natural Gas Co., 376 U.S.

---

cree, on the whole, is against the public interest."
See United States v. Carter Products, supra; United States v. CIBA Corp., 50 F.R.D. 507, 514 (S.D.N.Y.1970); Handler, The Shift from Substantive to Procedural Innovations in Antitrust Suits, 71 Col.L.Rev. 1, 22 (1971); see also City of Burbank v. General Elec. Co., 329 F.2d 825, 831 (9th Cir. 1964).
Prior to the entrance of the proposed decree in the instant case the court carefully scrutinized the decree in order to determine the adequacy of the relief provided for and insure that it was in the public interest. The background and purposes of the litigation and the provisions and object of the decree were fully disclosed to the court. It is not amiss to note at this point that after a settlement was agreed upon by the Justice Department and ITT, the Department, in accordance with departmental policy, 28

C.F.R. § 50.1(b), gave interested parties 30 days within which to examine the proposed decree and register objections to it. The prospective intervenors did in fact submit comments to the Department objecting to the terms of the decree. And they subsequently appeared as amici curiae in connection with the hearing on the motion of the government and ITT for entry of judgment.

3. Although the movant Robertson states that he is a Hartford policy holder,· the claim of a financial interest is not pressed. Obviously, the movants do not have standing to bring a private antitrust suit against ITT. See GAF Corp. v. Circle Floor Co., 463 F.2d 752 (2d Cir., 1972); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971); Billy Baxter Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

651, 662, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). *Cascade* is inapposite.

"It seems apparent from *Cascade* and other cases that the interest justifying intervention as of right in an antitrust suit brought by the United States must be substantial, must lie at the center of the controversy, and must be shown clearly, in the language of the Rule, to be less than 'adequately represented' by the Department of Justice. This would appear to harmonize fairly the procedural aims of the Rule and the perhaps more fundamental principles governing the role of the Attorney General of the United States in representing the 'public interest' in federal antitrust proceedings." United States v. CIBA Corp., *supra*, 50 F.R.D. at 513.

It is unnecessary to dwell on the insubstantiality of their interest, which is only what is inherent in their self-assumed role as "representatives of the public who desire to see that the antitrust laws are enforced." That does not amount to that "personal stake in the outcome of the controversy" essential to standing. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Even where it was alleged that first amendment rights were being violated by the government, the Supreme Court in Laird v. Tatum, 408 U.S. 1, 92 S. Ct. 2318, 33 L.Ed.2d 154 (1972), re-affirmed the rule of Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937), that "to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action." 408 U.S. at 13, 92 S.Ct. at 2325, 33 L.Ed.2d at 163,

quoting 302 U.S. 633–634, 58 S.Ct. 1. Cf. Cascade Natural Gas Corp. v. El Paso Natural Gas Co., *supra*, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814; United States v. First Nat'l Bk. & Trust Co., 280 F.Supp. 260, 263 (E.D.Ky.1967), aff'd per curiam sub nom. Central Bk. & Trust Co. v. United States, 391 U.S. 469, 88 S.Ct. 1845, 20 L.Ed.2d 749 (1968), where a competitor bank was allowed to intervene to oppose a consent judgment on a finding by the court that the United States had made "about a ninety per cent capitulation . . . ." (Notwithstanding, the court entered a consent decree.)

■■ In addition, to justify intervention, the allegedly inadequate representation by the Justice Department must be "shown clearly."[4] It is true that the movants' version of the public interest here differs from that held by the government officials involved in this case; but a mere showing that the Justice Department failed to agree with the movants' version of proper antitrust policy falls wide of proof that the public interest was inadequately represented.

The motion for intervention under Fed.R.Civ.P. 24(a)(2) or alternatively for permissive intervention under Fed. R.Civ.P. 24(b) is denied.

## III.

### *Fraud on the Court*

■ While intervention is clearly inappropriate, nevertheless the allegation of the prospective intervenors that the consent judgment was procured by misrepresentation, formally presented by their invocation of Rule 60(b)(3), is a disturbing claim of fraud on the court which in this case ought not be dismissed summarily. For if delusion's

---

4. The rule of pleading which allows a suit to be filed on the basis of allegations in the complaint without simultaneous evidence of their truth does not apply to Rule 24 intervention. The potential obstruction and delay which may be caused by allowing a person to intervene as a party to a suit fully justify the require-

ment that he make a clear showing rather than a mere allegation that his interest is not adequately represented by an existing party to the suit. Cf. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

victim on the one hand can be the public, it might on the other hand be the court. However, the court can consider this claim without the intervention of the movants as parties. See Root Refin. Co. v. Universal Oil Products Co., 169 F.2d 514 (3d Cir. 1948), on remand from Supreme Court, see Universal Oil Products Co. v. Root Refin. Co., 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946), cert. denied sub nom. Universal Oil Products v. William Whitman Co., 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949). Their status as amici curiae is fully adequate to bring this claim before the court. Fed.R.Civ.P. 60(b).[5]

Although amici curiae do not predicate their claim of bad faith on the part of counsel for the Justice Department, or fraud upon the court on any specific factual allegations of misrepresentation, the charges they have leveled ought to be unequivocally dispelled.[6] For that reason only, I undertake to discuss in greater measure than ought to be required the principles underlying the decree entered by this court.

The decree in this case and the conduct of the parties in negotiating the settlement on which it is based have been subjected to an unusually wide and deeply penetrating inquiry in the course of widely publicized hearings before the Committee of the Judiciary of the United States Senate.[7] The records of the hearings have been filed as exhibits and it is on that record only that amici curiae rely to support their contention that the decree is tainted by fraud.

A. *The Applicable Standard*

■ The court of appeals for this circuit has narrowly defined fraud on the

5. Fed.R.Civ.P. 60(b) in relevant part provides:
 "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . . . The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. *This rule does not limit the power of a court . . . to set aside a judgment for fraud upon the court. . . .*" (Emphasis added.)

6. In Segal v. Gordon, 467 F.2d 602 (2d Cir., 1972), pp. 606–607, the court of appeals for this circuit explained that the specificity requirement of Rule 9(b) that "(i)n all averments of fraud . . ., the circumstances constituting fraud . . . . shall be stated with particularity," "stems not only from the desire to minimize the number of strike suits but also more particularly from the desire to protect defendants from the harm that [sic] come to their reputations or to their goodwill when they are charged with serious wrongdoing:
 'It is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically.' (1A W. Barron & A. Holtzoff, Federal Practice and Procedure § 302, at 215–216 (Wright rev. 1960)."

7. In support of their contentions the prospective intervenors cite testimony and exhibits received at the Senate Judiciary Committee Hearings on the nomination of Richard G. Kleindienst as Attorney General. These hearings were held during March and April of 1972 at the request of Kleindienst for the purpose of investigating the circumstances surrounding the settlement of the Hartford case and the role of Kleindienst, who was acting Attorney General at that time, with respect to the settlement. The record of a portion of these hearings has been submitted to the court. Hearings on Nomination of Richard G. Kleindienst as Attorney General before the Senate Committee on the Judiciary, 92nd Cong., 2nd Sess., Parts 2 & 3 (1972) (hereinafter Kleindienst Hearings). This is the only evidence offered by the prospective intervenors and the parties.

court which warrants the setting aside of a judgment as:

" 'that species of fraud which does or attempts to defile the court itself . . . so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.' " Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801 (2d Cir. 1960), quoting 7 J. W. Moore, Federal Practice, para. 60.-33 at 512 (2d ed.).

See Kupferman v. Consolidated Research & Mfg. Co., 459 F.2d 1072, 1078–1079 (2d Cir. 1972); Kenner v. Commissioner of Internal Revenue, 387 F.2d 689, 691 (7th Cir. 1968); Lockwood v. Bowles, 46 F.R.D. 625, 631 (D. D.C.1969).

Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Root Refin. Co. v. Universal Oil Products, supra, 169 F.2d 514; 7 J. W. Moore, Federal Practice, para. 60.33 at 510–11. Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court. See Kupferman v. Consolidated Research & Mfg. Co., supra, 459 F.2d 1072; see also England v. Doyle, 281 F.2d 304, 310 (9th Cir. 1960).

## B. Specific Allegations of Fraud and ITT's Hardship Claim

The prospective intervenors do not claim that there was any malfeasance on the part of the Justice Department in connection with its decision to enter into settlement negotiations with ITT and its decision to accept the consent decrees which were the product of these negotiations. They have expressly disavowed any claim of bribery or corruption.[8] Compare, e. g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Root Refin. Co. v. Universal Oil Products, supra, 169 F.2d 514.

What the prospective intervenors now contend constitutes fraud on the court has been reduced to nothing other than the failure of the Justice Department "to disclose that the primary reason . . . (it) agreed to settle this action was because it accepted a claim of the defendant International Telephone & Telegraph Corp. . . . of potential hardship to it and its stockholders and of potential adverse effects on the economy and stock-market if . . . (the government) were to prevail and the court were to order ITT to divest Hartford." Prospective Intervenors' Motion to Set Aside Final Judgment at 1.

The theory of fraud on the court which the prospective intervenors advance is difficult to discern. As their thesis emerges it seems to have two elements. The first is that for the Justice Department even to consider the potential hardship on ITT shareholders of divestiture of Hartford in deciding to settle the case was so improper as to con-

8. In March of 1972, a series of newspaper articles appeared in which it was suggested that Congress should inquire whether the Justice Department had agreed to settle the ITT-Hartford case in return for a promise by ITT of financial support for the 1972 Republican National Convention in San Diego, California, and whether Richard G. Kleindienst, the then acting Attorney General had been a party to this agreement. These articles set in motion a series of events which ultimately led to the Kleindienst Hearings.

The prospective intervenors, however, have stated that they "are not now relying . . . upon any alleged connection between ITT's promise to partially underwrite the City of San Diego's commitment to the Republican National Committee (and the settlement) as a basis for its motion to set aside the (consent) decree." Prospective Intervenors' Brief in Support of Motion to Intervene at 22; see Transcript of Hearing of June 12, 1972, at 4–5.

stitute fraud. The second is that not to disclose to the court that the hardship claim made by ITT was one reason for settling the case constituted a fraud on the court. The obligations of the Justice Department with respect to both these contentions will be examined.

### 1. The "Hardship" Contention

It is undisputed that prior to the commencement of settlement negotiations, ITT did make the aforementioned "hardship" claim [9] in order to persuade the Justice Department to enter into settlement negotiations. It is also undisputed that ITT's hardship claim was a motivating factor in the Justice Department's decision to enter into settlement negotiations with ITT, and that the Justice Department did not disclose this to the court before its approval of the consent decree which was the product of these negotiations. However, that claim by the defendants had been in the case from the very beginning. This so-called "hardship" claim is more fully set forth in the margin as spelled out in a Memorandum from Richard W. McLaren, Assistant Attorney General Antitrust Division, to Deputy Attorney General Kleindienst, June 17, 1971, Kleindienst Hearings at 111.[10]

■■ In support of their contention that it was improper for the Attorney General to give ITT's "hardship" claim any consideration, the prospective intervenors argue that divestiture of Hartford was so decisively compelled by law that it had to be a *sine qua non* of any settlement. Primarily they rely upon United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961). That reliance is misplaced. In *du Pont* the Supreme Court held that where an acquisition of stock in one corporation by another had been adjudged to be in violation of Section 7 in a government antitrust suit and where there was no effective remedy to redress the violation short of complete divestiture of the acquired stock, the "Government cannot be denied the . . . (divestiture) remedy because economic hardship (to the shareholders of the company), however severe, may result." *Id.* at 327, 81 S.Ct. at 1250. The same rules do not apply to a settle-

---

9. There was nothing clandestine about this. During the Kleindienst Hearings, several witnesses testified that on April 29, 1971, a meeting was held in the office of Richard W. McLaren, who was then Assistant Attorney General (now a United States District Judge in the Northern District of Illinois), in charge of the Antitrust Division of the Justice Department, in order to give ITT an opportunity to present its arguments with respect to its hardship claim. This hearing was attended by a number of ITT representatives, and officials of the Justice and Treasury Departments. The Justice Department officials present were Kleindienst, McLaren, and 4 members of McLaren's staff, Walker B. Comegys, Robert Hummel, Charles Mahaffie and Raymond M. Carlson. The Treasury Department officials present were Bruce MacLaury, Deputy Under Secretary for Monetary Affairs and his assistant, Timothy Green. See Kleindienst Hearings at 98 and 102.

10. "About six weeks ago, representatives of ITT made a confidential presentation to the Department, the gist of which was that if we are successful in obtaining a divestiture order in the ITT-Hartford Fire Insurance Company case, this will cripple ITT financially and seriously injure its 250,000 stockholders. Essentially, this is because ITT paid a $500 million premium for the Hartford stock but took its assets in at book value in a so-called pooling of interests transaction. It cannot now sell its Hartford stock without (a) suffering a serious loss as opposed to what it paid but, at the same time (b) incurring a large capital gain tax. A 'spin-off' to its own shareholders would be a—and probably the only—feasible alternative; however, a spin-off would leave ITT with the large preferred dividend commitment it made in acquiring Hartford ($50 million a year), but without the earning power which was counted on to cover that commitment. The result, we are told, would be a loss of well over $1 billion in ITT common stock value, a weakened balance sheet, and reduced borrowing capacity. "We have had a study made by financial experts and they substantially confirm ITT's claims as to the effects of a divestiture order. . . . "

ment agreed upon between the parties and to a judicial determination of an antitrust violation.[11] Unlike the *du Pont* case, the Hartford case was not litigated to judgment. The ITT-Hartford merger has never been adjudged to be in violation of Section 7. While the remedy of complete divestiture may be required by a court despite hardship in the case of a litigated judgment, it does not follow that hardship is an improper factor to take into account in deciding whether to negotiate and accept a consent decree. Cf. United States v. Blue Chip Stamp Co., 272 F.Supp. 432, 440 (C.D.Calif. 1967), aff'd sub nom. Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968). Moreover, even in the case of a judicial determination that an acquisition was in violation of Section 7, a claim of hardship attendant upon complete divestiture can be considered in determining the appropriate remedy for the redress of antitrust violations where something short of divestiture will effectively redress the violation. See United States v. E. I. du Pont de Nemours & Co., *supra*, 366 U.S. at 327–328, 81 S.Ct. 1243. Neither in the decisional law nor in the statutes defining the powers and duties of the Attorney General to enforce the antitrust laws is there to be found any such limitation on the exercise of his discretion

in agreeing to consent decrees as the contention of the prospective intervenors implies. Swift & Co. v. United States, 276 U.S. 311, 331–332, 48 S.Ct. 311, 72 L.Ed. 587 (1928). Substantively, hardship upon a defendant when, considered as one factor in reaching a settlement of an antitrust suit, carries no implication of fraud.

### 2. *Justice Department's Duty to Disclose*

The second and perhaps independent contention of the prospective intervenors is that the Attorney General had a duty to disclose to the court that it had taken ITT's "hardship" claim into account in negotiating the settlement.

 This proposition ignores rules which have been predominant for years. Not every factor taken into account in a decision to settle an antitrust suit must be disclosed to the court. ITT's "hardship" claim was not the only factor which led the Justice Department to enter into settlement negotiations with ITT. Another important factor was the Justice Department's desire to avoid time consuming and expensive litigation.[12] See Testimony of Raymond M. Carlson, Transcript of Hearing on Motion for Entry of Final Judgment at 20 (September 23, 1971).

11. An important difference between the effect of a settlement ratified by a consent decree and a decree that has been imposed by the court without the consent of the parties is exemplified by Section 5(a) of the Clayton Act, 15 U.S.C. § 16, which provides that a final judgment in a government antitrust action has a prima facie effect in treble damage actions. Congress implicitly recognized consent decrees as a legitimate means of terminating government antitrust actions by excepting such decrees from this provision. Of course, Congress could, if it wished, limit in various ways the discretion of the Justice Department with respect to the settlement of government antitrust actions. Specifically, there has been and again is a proposal before Congress, similar to the one advanced by the prospective intervenors, that the Department be required to give a public statement of its reasons for settlement. See

Report of the Antitrust Subcommittee, House Committee on the Judiciary, 86th Congress, 1st Sess., Consent Decree Program of the Department of Justice 27 (Comm. Print 1959); 118 Cong.Record S. 10133 (June 26, 1972). But whatever the merits of such a proposal, it has not yet been adopted by Congress. Compare 8 U.S.C. § 1329 which requires that the reasons for the settlement of various immigration and naturalization suits must be disclosed and made a matter of record.

12. In the course of testifying at the Kleindienst Hearings, Erwin Griswold, the Solicitor General of the United States, stated that it would take a minimum of 2½ to 3 years for the Hartford case to be tried, decided by the district court, appealed by one party or the other, and decided in the Supreme Court. Kleindienst Hearings at 374.

More importantly, another factor in the Justice Department's decision to enter into settlement negotiations with ITT was the very real risk that if the Hartford case were litigated to a conclusion, the end result might be a judgment in favor of ITT. See Testimony of Richard McLaren, Kleindienst Hearings at 118, 284, 330–31. Uncertainty in the law always commends a compromise. See In re Prudence Co., 98 F.2d 559, 560 (2d Cir. 1938), cert. denied sub nom. Stein v. McGrath, 306 U.S. 636, 59 S.Ct. 485, 83 L.Ed. 1037 (1939). In the Hartford case, the government claimed that the effect of the ITT-Hartford merger, which was essentially a conglomerate merger, might be "substantially to lessen competition" in violation of Section 7 of the Clayton Act, but it must be remembered that there has long been a serious controversy concerning the applicability of Section 7 to conglomerate mergers. More than one eminent authority has taken the position that it may be difficult to establish that a true conglomerate merger is violative of the Section 7 prohibition against acquisitions which may substantially lessen competition. See, e. g., Turner, Conglomerate Mergers & Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313 (1965); Loevinger, How To Succeed in Business Without Being Tried, 12 Ariz. L.Rev. 443 (1970). In 1969, the Justice Department instituted for the first time a series of "test" suits challenging conglomerate mergers under Section 7.[13]

Among these suits were these three involving ITT: the ITT-Canteen case, the ITT-Grinnell case, and the ITT-Hartford case. Up to the time of the commencement of settlement negotiations in the ITT-Hartford case, the prosecution of these suits had been unsuccessful. The ITT-Canteen case and the ITT-Grinnell case had been tried, and in both cases judgments adverse to the government had been entered. See United States v. International Telephone & Telegraph Corp., supra, 324 F.Supp. 19; 1971 Trade Cases, para. 73,619 (N.D.Ill.1971). While the ITT-Hartford case had not as yet been tried, the government's request for a preliminary injunction had been denied, after just about all of the evidence had already been presented, on the ground that the government had not sustained its burden of showing a likelihood of success at trial on the merits. See United States v. International Telephone & Telegraph Corp., supra, 306 F.Supp. 766. There was a considerable division of opinion in the Justice Department about the government's chances of ultimate success in the Hartford case as well as in the other ITT cases.[14] In view of the foregoing, it is hardly surprising that the Justice Department was prepared to consider settlement. As Chief Judge Friendly recently noted in upholding the approval of a settlement in a minority shareholders' action, " . . . Plautus warned long ago 'what a ticklish thing it is to go to law,' and the ticklishness does not diminish as

13. Under prior administrations the Antitrust Division of the Justice Department had not attempted to attack the purer types of conglomerates under Section 7 apparently because those in positions of authority were of the opinion that Section 7 did not reach such mergers. See McLaren, Statement before House Ways and Means Committee, March 12, 1969, quoted in United States v. International Telephone & Telegraph Corp., supra, 306 F.Supp. at 797 n. 93.

14. Although Judge McLaren was optimistic about ultimate success he recognized that "success was far from certain." Kleindienst Hearings at 254; see also Kleindienst Hearings at 118, 284,

330–32. Erwin Griswold, the Solicitor General of the United States, testified that it was his "best judgment that the Government would lose all three (ITT) cases in the courts ultimately." Kleindienst Hearings at 374; See also 372, 377. As regards the Grinnell case, he specifically testified that he had authorized the appeal of the Grinnell case with some reluctance and felt that it would be difficult to win, both because of the status of the law with respect to conglomerate mergers and because the court below had made findings of fact which were quite damaging to the government's position and would be difficult to overcome. Kleindienst Hearings at 372.

the pinnacle is reached." Newman v. Stein, 464 F.2d 689 (2d Cir., 1972), at 695.

Congress has vested United States Attorneys, acting under the direction of the Attorney General, with wide discretion to institute proceedings in equity to prevent and restrain violations of Section 7 of the Clayton Act. See 15 U.S.C. § 25. Equally the Justice Department has wide discretion to settle government antitrust actions through the negotiation of consent decrees. See Sam Fox Publishing Co. v. United States, *supra*, 366 U.S. at 689, 81 S.Ct. 1309; United States v. Automobile Mfgrs. Ass'n, *supra*, 307 F.Supp. at 620; United States v. Blue Chip Stamp Co., *supra*, 272 F.Supp. at 440; United States v. Carter Products, Inc., *supra*, 211 F.Supp. at 148; United States v. CIBA Corp., *supra*, 50 F.R.D. at 513–514. It is well established that such decrees are not only permissible, but often desirable. See United States v. Blue Chip Stamp Co., *supra*; United States v. Carter Products, Inc., *supra*; United States v. Automobile Mfgrs. Ass'n, *supra*.

The amici curiae have not cited a single instance in which the United States has been compelled to disclose its motives for settlement. The cases which they cite as supporting a duty to disclose are so clearly inapposite that it would be totally unproductive to discuss them for the purpose of showing they are not analogous. Disclosure of the motives for settlement of a government antitrust suit is not required, absent evidence of bad faith. See Sam Fox Publishing Co. v. United States, *supra*, 366 U.S. at 689, 81 S.Ct. 1309. The well-established rule followed in this circuit is that "(i)t suf-

ficed for the court to know the parties had decided to settle, without inquiring why." Martina Theatre Corp. v. Schine Chain Theatres, Inc., *supra*, 278 F.2d at 801. These principles furnish an adequate accommodation between the exercise of administrative discretion and the protection of the integrity of the judicial process. See United States v. Automobile Mfgrs. Ass'n, *supra*, 307 F.Supp. at 620–621.

> "The remedy (for abuse or misuse of this wide discretion) lies ultimately within the establishment where power and discretion reside. The President has abundant supervisory and disciplinary powers—including summary dismissal—to deal with misconduct of his subordinates." Newman v. United States, 127 U.S.App.D.C. 263, 382 F. 2d 479, 482 (1967) (Burger, J.).

a. *Good Faith of Justice Department in Negotiating Settlement*

There has been no showing whatever by the prospective intervenors that the Justice Department acted in bad faith in entering into settlement negotiations with ITT, in negotiating a settlement, or in accepting the consent decrees which were the products of these negotiations. Prior to the entry of final judgment the prospective intervenors took the position and they still maintain that the Justice Department should have obtained a fuller measure of relief, to wit: the complete divestiture of Hartford by ITT. It is easy for amici curiae, who have no responsibility to anyone except themselves, to advocate this "all or nothing" strategy.

The settlement of a government antitrust suit by means of a consent decree is permissible.[15] There was nothing improper in the Justice Department's nego-

---

15. The prospective intervenors correctly point out that the Justice Department's decision to negotiate a settlement with ITT and to accept the consent decree which was the product of these negotiations was essentially an "administrative decision." United States v. Automobile Mfgrs. Ass'n, *supra*, 307 F.Supp. at 620. And the principle enunciated in Sam

Fox Publishing Co. v. United States, *supra*, 366 U.S. at 689, 81 S.Ct. 1309, is in accord with the well-established rule that "inquiry into the mental processes of administrative decisionmakers is usually to be avoided" and that "there must be a strong showing of bad faith or improper behavior before such inquiry may be made." Citizens to Preserve

tiation of a settlement with ITT. The "decision to settle an antitrust case . . . like the decision to commence it . . ." is "not subject to review." United States v. Automobile Mfgrs. Ass'n, *supra*, 307 F.Supp. at 620. See also Swift & Co. v. United States, *supra*, 276 U.S. at 331–332, 48 S.Ct. 311. Indeed, the prospective intervenors have expressly disavowed "any claim that the settlement was necessarily improper." Prospective Intervenors' Brief in Support of Motion to Intervene at 3. Obviously settlement negotiations which result in the complete capitulation or nearly complete capitulation of a party are rare. Consent decrees by their very nature are the product of bargaining and compromise. "(T)hus, (they) typically may provide something less than the full relief prayed for . . . ." United States v. Blue Chip Stamp Co., *supra*, 272 F.Supp. at 440.

The real issue is not whether the Justice Department could or should have insisted on complete divestiture of Hartford before agreeing to settle the case.

Rather, it is whether the Justice Department negotiated the settlement in bad faith. See Sam Fox Publishing Co. v. United States, *supra*, 366 U.S. at 689, 81 S.Ct. 1309. While ITT's "hardship" claim was one of the factors which led the Justice Department to enter into settlement negotiations, it is analytically fallacious to regard the Department's recognition of that factor as an element of bad faith.

### b. *The Settlement*

■ While the manner of obtaining the settlement is distinguishable from what was obtained thereby, nevertheless substantial affirmative evidence of the Justice Department's good faith in this respect is found in the terms of the consent decree itself.

The decree obtained in this case is hardly a "watered-down" result. The settlement is entirely consistent with the antitrust objectives of preventing anticompetitive conduct. It clearly protects the public against the anticompetitive dangers of the Hartford-ITT merger which were alleged in the complaint.[16]

---

Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) ; see United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). Cf. Boyd v. United States, 345 F.Supp. 790 (1972).

16. In view of the proposed challenge to the validity of the decree in the Hartford case a more detailed outline of the relief obtained by the decree in relation to the government's challenge to the merger, omitted at the time the settlement was approved, is now appropriate.

(1) One of the government's major claims was that the Hartford merger would create a market structure conducive to reciprocal dealing, leading to reciprocal purchasing arrangements which would tend to substantially lessen competition in violation of Section 7. United States v. International Telephone & Telegraph Corp., *supra*, 306 F. Supp. at 786.

The decree contains elaborate prohibitions against reciprocal dealing.

(2) Another major claim was that the merger would provide certain ITT subsidiaries, particularly Levitt & Sons, Inc. and Avis, Inc. with competitive advantages that might result in a sub-

stantial lessening of competition. At the evidentiary hearing on the government's motion for a preliminary injunction, the government specifically alleged that the merger would give Levitt, which was allegedly the dominant competitor in certain lines of commerce in certain sections of the country, access to Hartford's considerable financial resources and that this would give Levitt a competitive advantage by enabling it to finance its expansion plans. See 306 F.Supp. at 791.

The decree required ITT to divest itself either of Hartford or of Levitt and Avis.

(3) The government also claimed that the merger would eliminate actual and potential horizontal competition. Specifically, the government alleged that it would eliminate horizontal competition because both Hartford and certain ITT subsidiaries wrote life insurance. See 306 F.Supp. at 795.

The decree required ITT to divest itself of Hartford or of its life insurance company subsidiaries (Hamilton Life Insurance Company and its subsidiary the ITT Life Insurance Company of New York), which were in competition with the life insurance group of Hartford.

Its salient features are, first, that it provides for the divestiture of Canteen which resulted in everything the government could have obtained by winning that case on appeal; second, it provided for the divestiture of the fire protection division of Grinnell,[17] which was the only portion of Grinnell claimed to have anticompetitive consequences; third, as an alternative to divestiture of Hartford Fire, it provided for the divestiture of four other ITT subsidiaries (including two very important ones, Levitt and Avis) whose operations in combination with Hartford Fire had been alleged to produce anticompetitive consequences. The significance of the latter divesti-

tures is demonstrated by Judge Mc-Laren's testimony that if ITT had not owned those companies at the time of its acquisition of Hartford Fire, the United States would not have challenged that acquisition. Kleindienst Hearings at 123.

According to Judge McLaren: "we got absolutely everything we would win or we would want to win in Grinnell, and so far as Hartford was concerned, we pared off other companies which, under the control of ITT, might be used with Hartford for anti-competitive ends. And we thought we had achieved really as much as we could by going through

(4) In addition, the government claimed that the merger had some of the characteristics of a vertical merger. Specifically, the government alleged that ITT and its subsidiaries were substantial purchasers of insurance of the type sold by Hartford and that the access of Hartford's competitors to this market would be foreclosed as a result of the merger. See 306 F.Supp. at 792.

The decree enjoined ITT and Hartford from discriminating in favor of each other in the purchase of ITT's insurance requirements.

(5) Still another claim of the government was that the merger would give the fire protection division of Grinnell a competitive advantage. Specifically, the government alleged that Hartford, which writes fire insurance, might use its position and influence to assist the fire protection division in securing sales of its products.

The Hartford decree enjoined Hartford from engaging in such activity as long as ITT owned any interest in Grinnell's fire protection division. Moreover, the ITT-Hartford decree was part of a larger settlement involving the settlement of the Grinnell and Canteen cases. The Grinnell consent decree required ITT to divest itself of Grinnell's fire protection division.

(6) Finally, the government attacked the merger on the ground that it would lead to a great concentration of economic power in the hands of ITT, one of the country's largest corporations. See 306 F.Supp. at 796.

As already pointed out, the Hartford decree required ITT to divest itself either of Hartford or of Levitt and Avis,

two of its most important subsidiaries, as well as its life insurance company subsidiaries. And the consent decrees in Grinnell and Canteen required ITT to divest itself of Canteen and the fire protection division of Grinnell. Taken together these decrees required the divestiture of companies with aggregate annual sales of more than $1 billion. The decrees, which are effective for ten years, prohibit ITT, without prior permission of the Department or approval of the Court, from acquiring any domestic company with assets of over $100 million; and from acquiring any firm with annual sales of over $25-million and having in any section of the country more than 15% of the sales in any line of commerce in which total sales exceed $100 million, and in which any 4 companies have combined sales in excess of 50% of total sales in any section of the country.

Justice Department officials anticipated that these decrees, requiring as they did a divestiture of great magnitude by one of the largest of the conglomerate corporations, would act as a deterrent to other companies that contemplated a conglomerate merger program.

17. It was felt that:
"separating the Fire Protection Division from the rest of Grinnell would be a procompetitive step, putting the rest of the industry on a more even competitive basis with Grinnell, which incidentally was the leader in that particular industry, which had had a competitive advantage by reason of its vertical integration and its broad contacts in the construction business." Kleindienst Hearings at 113.

the appeals. Furthermore, we had a solid order against reciprocity, . . . and we had a very solid order against further acquisitions of the major sort." Kleindienst Hearings at 118.[18] While the court comprehends the concern of the prospective intervenors over the danger of unbridled economic concentration, nevertheless it agrees with Judge McLaren's assessment of the adequacy of the consent decree obtained in this case. Within the limits of existing statutes, the settlement is entirely consistent with the antitrust objectives of preventing anticompetitive conduct.

The decree more than meets the standard set forth in United States v. CIBA Corp., *supra*, 50 F.R.D. at 514:

"(T)he decree falls short of the relief originally sought, but it goes a long way toward the competitive situation at which the government's efforts have been aimed. The decree is, after all, a *settlement*. It accomplishes assured and immediate results without proof of the contentions in the complaint, which proof nobody suggests would necessarily be sufficient. . . There is, in sum, ample ground for finding in the judgment a sound compromise achieved by government counsel with undivided loyalty and effective attention to the public interest."

In the course of his testimony, Judge McLaren epitomized the application of this principle in two short sentences: "What we obtained was substantial assured relief. What we gave up was the chance to have our legal theories tested in the Supreme Court." Kleindienst Hearings at 254–255.[19] In the court's view it was far the wiser choice to accept as much as possible without taking the risk of losing all.

18. Despite the fact that no court has adopted the novel theory that pure conglomerate mergers fall within the proscription of Section 7, the portion of the decree which limits further major acquisitions by ITT may have precedential value for that view. See Testimony of

## IV.

### Conclusion

To sum up, the Justice Department's failure to disclose that ITT's "hardship" claim was a motivating factor in its decision to enter into settlement negotiations with ITT cannot be said to constitute fraud on the court. This court had a limited role in approving the Hartford consent decree, namely, to inquire into the merits of the decree in order to insure that the relief provided was adequate and that the decree was in the public interest. The reasons for the Justice Department's decision to negotiate a settlement of the Hartford case were simply not relevant to such an inquiry. Cf. Keys v. Dunbar, 405 F.2d 955, 958 (9th Cir.1969); England v. Doyle, *supra*, 281 F.2d at 310; see also Hadden v. Rumsey Products, 196 F.2d 92, 96 (2d Cir.1952). Thus, the Justice Department had no duty to disclose that ITT's "hardship" claim was one of the factors in its decision to enter into settlement negotiations. Its failure to disclose this fact in no way "defile(d) the court itself" and in no way impaired the effective functioning of the court in connection with the consent decree. See Martina Theatre Corp. v. Schine Chain Theatres, Inc., *supra*, 278 F.2d 798.

The charge of fraud on the court made by the prospective intervenors is completely unfounded and unjustified. Their briefs and the statements of their counsel during oral argument make it clear that the real reason they seek to have the Hartford decree set aside is that in *their* view the Justice Department's negotiation of a settlement with ITT and its acceptance of the consent decrees which were the product of these negotiations were not in the public interest. While reasonable men may dif-

Judge McLaren, Kleindienst Hearings, at 118, 284.

19. From the point of view of Solicitor General Erwin Griswold it was "(n)ot only a good settlement . . . but a very good settlement." Kleindienst Hearings at 377.

fer over what the goals and policies of the Department should be with respect to conglomerate mergers in view of the existing antitrust laws the fact that Mr. Nader and Mr. Robertson, III, disagree with the Justice Department cannot be equated with fraud on the court.

The court, having concluded that the movants' claim that the plaintiff United States committed fraud on the court is wholly without merit, declines to reopen the judgment heretofore entered by the court with the consent of the parties.

The movants' motion for permission to intervene in the instant case pursuant to Fed.R.Civ.P. 24(a)(2) and 24(b)(2) is denied.

So ordered.